**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JAN 18 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

# UNITED STATES COURT OF APPEALS
# TENTH CIRCUIT

---

WEBCO INDUSTRIES, INC., Sued
as: Webco Industries, Inc.,

      Plaintiff-Appellant/
      Cross-Appellee,

v.

THERMATOOL CORP.; ALPHA
INDUSTRIES INC.,

      Defendants-Appellees/
      Cross-Appellants.

Nos. 99-5136, 99-5148

---

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 97-CV-708-H)**

---

Frederick J. Hegenbart of Rosenstein, Fist & Ringold, Tulsa, Oklahoma, (Mark
Grossman of Grossman & Grossman, Ltd., Chicago, Illinois, with him on the
briefs), for Plaintiff-Appellant/Cross-Appellee.

Joseph R. Farris (Jody R. Nathan with him on the briefs), of Feldman, Franden,
Woodard & Farris, Tulsa, Oklahoma, for the Defendants-Appellees/Cross-
Appellants.

---

Before **SEYMOUR**, Circuit Judge, **MCWILLIAMS**, Senior Circuit Judge and **BELOT**[*], District Judge.

_____

**SEYMOUR**, Circuit Judge.

_____

Webco Industries, a manufacturer of custom tube, bought a machine for cutting tube from Thermatool Corporation and Alpha Industries (Thermatool), manufacturers of cutting, heating, and welding machines for the pipe and tube industry.[1] When the machine did not perform as anticipated, Webco brought this diversity action against Thermatool alleging, inter alia, breach of contract, breach of express and implied warranties under the Uniform Commercial Code (UCC), and breach of a performance guarantee.

In a pretrial order, the district court ruled that limiting language in Thermatool's order acknowledgment precluded Webco's contract and UCC claims and, alternatively, that these claims were barred by the applicable statute of limitations. The claim for breach of the performance guarantee was tried to a jury, which returned a verdict in favor of Webco for $1,115,500, an amount that exceeded the $735,000 purchase price of the machine by $380,500. In post-trial

_____

[*]The Honorable Monti L. Belot, District Judge, United States District Court for the District of Kansas, sitting by designation.

[1] Inductotherm, a privately held corporation, is the parent of both Thermatool and Alpha Industries. The defendants were treated as one entity throughout the proceedings below and we will continue to do so on appeal.

rulings, the district court denied Webco's request for prejudgment interest and for attorneys' fees.

Webco appeals, contending the court erred in ruling that the contract and UCC claims were barred, and in failing to award prejudgment interest and attorney's fees. Thermatool cross-appeals, asserting that it was entitled to judgment as a matter of law on Webco's claim to enforce the performance guarantee and, alternatively, that Webco's damages on that claim should have been limited to the purchase price of the machine. We affirm in part, reverse in part, and remand for further proceedings.

# I

## BACKGROUND

The background facts set out here are relevant to Thermatool's argument on appeal that it was entitled to judgment as a matter of law on Webco's claim under the performance guarantee. *See* Part III.A., infra. Accordingly, we view the record in the light most favorable to the prevailing party and give that party the benefit of all reasonable inferences to be drawn from the evidence. *See James v. Sears, Roebuck & Co.*, 21 F.3d 989, 992 (10th Cir. 1994).

Prior to the events giving rise to this lawsuit, Webco had purchased several pieces of equipment from Thermatool. In 1989, Webco was at full capacity and

wanted a new mill to broaden its production line and customer base. Accordingly, the parties began discussions concerning the purchase and sale of an induction parting machine (IPM) to be put into operation in the new mill. The IPM cut tube by heating it and pulling it apart rather than by cutting it with a saw. Bill Obermark, who was vice president for technical services with Webco at the time, had seen an IPM at a plant in Germany and had been favorably impressed with its fast, clean and quiet operation. Although Thermatool had never built an IPM, its regional sales manager, Gary Doyon, told Mr. Obermark that Thermatool was interested and anxious to build the machine and that the Thermatool engineering department was "extremely confident in the machine's capabilities." Aplt. App. vol. III at 773.

Thermatool submitted a proposal to Webco to build an IPM. On July 10, 1989, in response to conversations with Webco personnel, Mr. Doyon sent a letter to Webco clarifying the performance guarantee it had made with respect to the IPM. The letter stated:

> The specification parameters for performance will be set by [Webco] and accepted by Thermatool. After startup, if the cutoff system fails to meet these specifications, Thermatool will make every effort to rectify the problems or take back the cutoff and remit monies paid to Thermatool to that point.
>
> We offer this comprehensive performance guarantee as a direct result of our confidence in the proposed system.

*Id.* at 785.

In August, Webco sent a purchase order for the IPM to Thermatool which stated that its acceptance was limited to the terms on the reverse side, and that any additional or different terms in the acceptance would be void unless Webco agreed to them. The reverse side of the purchase order stated that "Buyer [Webco] shall be entitled to all rights and remedies as set forth in the Oklahoma version of the Uniform Commercial Code." *Id.* at 790. After a meeting between Webco and Thermatool personnel, Thermatool sent Webco an invoice and an acknowledgment. The acknowledgment recognized that, pursuant to Webco's specifications, the machine could not mark tube with more than a 0.003 inch indentation, and further provided that Thermatool would provide startup assistance "for the purpose of inspecting the installation, performing in the field adjustments and instructing customer's personnel in the proper use of the equipment," *id.* at 812. The acknowledgment also stated that the terms and conditions on the back were the only ones applicable to the order. The back of the page stated that Thermatool's warranty did not cover "losses, costs, expenses, liabilities and damages ( . . . and all other consequential damages)." *Id.* at 814.

Thermatool built the machine and sent it to Webco, who paid the purchase price in full. Because Webco was having problems with its financing for the new mill, the machine was placed in storage for four years after it was delivered to Webco while Webco worked out its financing and constructed the mill.

Thermatool was aware of the situation and agreed to extend its performance guarantee through the storage period and the time the IPM was placed into service. When the mill was completed in 1994, Webco began preparations to remove the IPM from storage, assemble it, and prepare it for service.

It is undisputed that the machine could not be installed as configured by Thermatool. In its original configuration, IPM did not fit the space envelope provided for it, and parts would have hit one another during operation. This problem became apparent in early 1994 as Webco was preparing to install the IPM in the mill. Webco notified Thermatool of the situation in March 1994. In April, Thermatool representatives visited the plant to observe the problem first-hand and agreed that some modifications had to be made. Webco requested that Thermatool set up a schedule for the required modifications so that the installation could proceed and the mill could begin operation. When Thermatool did not provide the schedule or make the required modifications, Webco ultimately started making the modifications in early October, with input from Thermatool personnel. The IPM was placed into operation the last week of October and the first week of November 1994.

It is also undisputed that prior to delivery the IPM did not conform to Webco's specifications and that Thermatool was aware of this fact. Pre-delivery testing by Thermatool showed that the IPM consistently marked tube in excess of

the 0.003 inch limit set by Webco. Specifically, when the jaws that pulled the tube apart exerted sufficient force to part the tube, the teeth in the jaws left marks in the tube that exceeded the specification. Webco presented evidence at trial that it was unaware of the marking problem until after the machine began operation.

Although the IPM otherwise performed well after the mill became operational, the jaw teeth continued to mark the tube in excess of 0.003 inches. Webco presented testimony at trial from its founder and chairman of the board, Bill Weber, describing the problems created by the marks.[2] Mr. Weber testified that the marked pipe would be rejected by Webco's customers, that the company therefore could not sell it, and that it could not be cut due to length requirements. Webco was thus required to scrap it. Thermatool has never disputed the legitimacy of Webco's marking specification.

When the IPM began operation the first week of November 1994, Bill Obermark of Webco observed the marking problem. He pointed it out to Thermatool personnel assisting with the startup, and listed the jaw design as an item of discussion with Thermatool engineers. At the end of November, Mr.

---

[2] Mr. Weber testified that one particular customer took tube, applied a lubricant to it and extruded it. "These marks will cause [the customer's] extruding system to gall the metal, pick up the metal and it balls up and basically will break a die, break a mandrel, those kinds of things. Also, this [kind] of mark would . . . not clean up in a centerless grinding process that we talked about earlier . . ." Aplee. App. vol. I at 77.

Obermark asked Thermatool for a progress report and was told that Thermatool's engineering department would work on developing a new jaw design and get back to him. *See* Aplt. App. vol. IV at 1007. Mr. Obermark testified at trial that he had heard nothing from Thermatool by the end of the year and that everything the IPM was making was scrap. He therefore felt that Webco had to design and manufacture its own jaws. Webco began to do so and sent a copy of the engineering to Thermatool for its reference and opinions. Webco also returned the Thermatool jaws to the company with a request that Webco receive a credit, which Thermatool did not honor. Thermatool personnel did not respond to Webco's alternative jaw design, and Webco continued to attempt to develop a design that did not mark the tube. Webco was ultimately able to use its jaws to produce a certain amount of tube that met the marking specification.

Thermatool engineers came to the mill in July 1995 to see the problem and determined that the markings were caused because the machine did not have the capacity to grip the tube with sufficient strength. In August 1995, Thermatool proposed a solution that required using a redesigned jaw that would grip the tube using a hydraulic pressure system rather than the cam system already in place. The design of the hydraulic system was discussed by Webco and Thermatool personnel through January 1996. During that time Webco lost substantial profits because it was unable to manufacture tube required by many of its customers.

Although Thermatool produced an acceptable design in March 1996, it demanded that Webco pay for the modifications. At a meeting between Webco and Thermatool personnel, Webco agreed to pay half the cost of the fix if Thermatool could get the changes made by August 31. Thermatool was to provide Webco an implementation schedule within one week of the meeting. Webco nonetheless began to investigate alternative cutting technologies.

Thermatool did not provide the required schedule nor make the agreed modifications. In correspondence with Webco immediately before the August 31 deadline, Thermatool first mentioned to Webco its opinion that the problem with the machine might be electrical rather than mechanical. In September, Thermatool sent Webco a letter stating that the IPM had a heating problem in addition to inadequate clamping force, and that this problem was in turn the result of electrical problems caused by the original modifications done by Webco in order to fit the IPM into the mill space. Webco bought an alternative machine in September and switched out the IPM in February 1997.

## II

### THE PRETRIAL RULING

Webco moved for summary judgment on its contract and UCC claims, asserting the undisputed facts established that Thermatool had breached the

contract by selling Webco a machine violating the specifications agreed upon by the parties. Webco asserted it was entitled as a matter of law on the resulting undisputed damages. Thermatool sought a summary judgment ruling that its maximum liability was limited to a refund of the purchase price paid to it by Webco. The district court ruled that Webco's contract and UCC claims were limited by the terms set out in Thermatool's order acknowledgment, which excluded liability for "losses, costs, expenses, liabilities and damages (including loss of use or profits, all liabilities of the buyer to its customers or third persons and all other consequential damages)." Aplt. App. vol. III at 814. Alternatively the court held that Webco's contract and UCC claims, other than those based on Thermatool's performance guarantee, were barred by the applicable statute of limitations.[3]

The parties agree that the claims raised in this diversity action are governed by Michigan law. Webco contends the district court erred in ruling that the terms of Thermatool's acknowledgment governed the remedies available for breach of

---

[3] The district court denied Thermatool's motion for partial summary judgment, holding that the performance guarantee limited damages to the purchase price unless Webco proved that Thermatool breached its obligation to make every effort to rectify the problems. In that event, Webco would be entitled to recover out-of-pocket expenses incurred in making the repairs necessary to bring the IPM's performance up to the contract specifications. The court further held that material fact issues existed as to whether Thermatool breached its contract with Webco, and that the matter would proceed to trial, with the damages limited as described above.

contract, asserting, inter alia, that under Michigan law the purported limitation is "knocked out" by the conflicting term in Webco's order and it is invalid because it is inconspicuous. We need not decide these issues, however, because we conclude that even if Webco is correct in contending that the acknowledgment was not a valid limitation of remedies, the contract and UCC claims are barred by the applicable statute of limitations.

The warranty provisions of Michigan's version of the UCC are governed by the statute of limitations set out in MICH. COMP. LAWS ANN. § 440.2725 (West 2000). Section 2725 provides that "[a]n action for breach of any contract for sale must be commenced within 4 years after the cause of action has accrued." *Id.* § 2725(1). The section further provides that a "cause of action accrues when the breach occurs," and that a "breach of warranty occurs when tender of delivery is made." *Id.* § 2725(2). Under Michigan law, tender of delivery occurs for purposes of the limitation period when the seller delivers the goods, even if they are defective when measured against the contract's requirements. *See Baker v. DEC Int'l*, 580 N.W.2d 894, 897 (Mich 1998).[4] In this case, Thermatool delivered the IPM to Webco in 1989 and Webco did not file the present action

---

[4] We point out that we are here concerned only with Webco's claims for breach of contract and breach of warranties provided by Michigan's version of the UCC. Thermatool's performance guarantee is not governed by the limitation period because Thermatool expressly waived it as to that guarantee.

until 1998, long after the four year period had expired.

Webco seeks to bring this case within the exception recognized by the court in *Baker*, under which "[i]f installation were a term of the contract, then mere physical delivery would not fulfill defendant's contractual obligation. Only when the component parts were fully installed could the defendant be viewed as tendering goods 'as if in' fulfillment of its contractual responsibilities." *Id.* at 898. Under this exception, if the seller were contractually obligated to install the goods, tender would not occur until that contractual obligation had been fulfilled. Webco argues the exception applies here because under the terms of Thermatool's acknowledgment, Thermatool was contractually obligated to provide startup assistance consisting of "15 days, excluding travel time, for the purpose of inspecting the installation, performing in the field adjustments and instructing customers personnel in the proper use of the equipment." Aplt. App. vol. III at 812. Webco argues that these obligations are identical to the installation obligation at issue in *Baker* for purposes of extending the limitation period. We disagree.

The court in *Baker* specifically distinguished between a contractual obligation to install and the obligation to inspect and test relied on by Webco. The court stated that "'tender of delivery' is not contingent upon inspection, testing, or acceptance in the absence of a clear contractual provision to the

contrary." *Baker*, 580 N.W.2d at 898. The court pointed out its holding was consistent with those of many other jurisdictions interpreting the UCC, noting that "[m]any courts have held that contractual provisions for postdelivery testing or inspection do not toll the accrual of breach of warranty claims. *Id.* at 898 n.14. As examples of such holdings the court cited *H. Sand & Co. v. Airtemp Corp.*, 738 F. Supp. 760 (S.D.N.Y. 1990), *rev'd in part on other grounds*, 934 F.2d 450, 457 (2d Cir. 1991) (inspection provision in contract does not postpone tender of delivery); *City of Cincinnati v. Dorr-Oliver, Inc.*, 659 F. Supp. 259 (D. Conn. 1986) (tender of delivery is not contingent upon inspection, testing, or acceptance); *Ontario Hydro v. Zallea Syst., Inc.*, 569 F. Supp. 1261 (D. Del. 1983) (inspection clause in contract did not affect tender of delivery). In view of the express language in *Baker* and the cases it cites, we conclude that under Michigan law postdelivery obligations to inspect, test and provide instruction do not toll the accrual of a breach of warranty claim unless the contract specifically so provides. We therefore affirm the district court's holding that Webco's claims for breach of contract and breach of UCC warranties are time-barred.

# III

# THE CROSS APPEAL

A. *Judgment as a Matter of Law*

In its cross appeal, Thermatool claims Webco's alteration of the IPM's configuration voided all warranty remedies and Webco is therefore not entitled to any damages. Thermatool contends Webco's changes made it impossible for Thermatool to perform its contract obligation to bring the machine into compliance with Webco's specifications. Consequently, Thermatool believes it was entitled to judgment as a matter of law under FED. R. CIV. P. 50. Webco responds that the evidence at trial shows Thermatool had ample opportunity to rectify the problems before Webco made the modifications, but chose not to do so, and that in any event the modifications did not prevent Thermatool from rectifying the marking problem.

In reviewing the denial of a Rule 50 motion, we determine only whether the jury verdict is supported by substantial evidence when the record is viewed most favorably to the prevailing party. *See Beck v. N. Natural Gas Co.*, 170 F.3d 1018, 1022 (10th Cir. 1999). Substantial evidence is something less than the weight of the evidence, and is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, even if different conclusions also might be supported by the evidence." *Id.* (internal quotations omitted). We

-14-

do not retry issues, second guess the jury's decision-making, or assess the credibility of witnesses and determine the weight to be given their testimony. *Id.* It is the province of the jury, and not this court, to resolve conflicts in the evidence. *Thunder Basin Coal Co. v. Southwestern Pub. Serv. Co.*, 104 F.3d 1205, 1213 (10th Cir. 1997). "Thus, the mere existence of contrary evidence does not itself undermine the jury's findings as long as sufficient other evidence supports the findings." *Id.*

As set out in Part I supra, Webco presented evidence demonstrating that Thermatool knew before it delivered the IPM that the machine did not meet Webco's marking specification. Webco also presented evidence that Thermatool agreed the IPM could not operate in the mill as originally configured and that Thermatool had several months in which to reconfigure the machine before Webco did so. Evidence in the record also tends to show that Thermatool at least tacitly approved Webco's decision to reconfigure by providing engineering input for Webco's modification plans. In addition, Webco presented evidence through three expert witnesses who had tested the IPM. These witnesses testified that the modifications to the configuration made by Webco did not adversely affect the machine's performance and in fact may have enhanced its operation.

Webco thus presented evidence from which the jury could have found that Thermatool did not avail itself of the opportunity to modify the machine's

configuration even though Thermatool agreed that a modification was required before the machine could be operated. Webco also presented evidence to support the jury's determination that Thermatool was not prevented by Webco's modifications from complying with its contractual obligation to rectify the machine's marking problems. In view of the sufficient evidence supporting Webco's claims, Thermatool's contrary evidence does not undermine the jury's findings. Accordingly, we affirm the district court's denial of Thermatool's Rule 50 motion for judgment as a matter of law.

B. *Damages*

Thermatool also contends in its cross appeal that the trial court erred in permitting Webco to recover as damages more than the purchase price it paid for the IPM. As we noted above, the district court held in a pretrial ruling that Webco's damages were limited by the performance guarantee to the purchase price unless Webco demonstrated that Thermatool had violated the guarantee by failing to make every effort to rectify the problems with the machine's performance. In that event, Webco would be entitled to recover its out-of-pocket expenses for any repairs Webco made to bring the IPM into compliance with the agreed specifications. In accordance with this ruling, the court instructed the jury:

> 1. If you find that Thermatool had a reasonable opportunity to rectify the problem of the cutoff machine and made every effort to do

so, then you must find that Webco is entitled to damages limited to $735,000, the amount paid by Webco to Thermatool for the machine. You may also award interest on that amount; or

2. If you find that Thermatool had a reasonable opportunity to rectify the problem of the cutoff machine and did not make every effort to do so, then you must find that Webco is entitled to damages in the amount paid by Webco to Thermatool for the machine and you must further determine the amount of out-of-pocket expenses incurred by Webco, as a result of Thermatool's breach of express warranty, for any repairs performed to cause the cutoff machine to meet agreed specifications. This amount of out-of-pocket expenses should then be added to the $735,000 amount paid by Webco to Thermatool for the machine. You may also award interest on that total amount.

Aplt. App. vol. II at 648

The purchase price of the IPM was $735,000. Webco presented undisputed evidence that it paid financing charges on the machine itself in the amount of $330,507. In addition, Webco's uncontroverted evidence demonstrated that, in its attempts to eliminate the marking problem, it paid $211,000 in supplies and $339,000 in manpower, as well as $247,318 in interest on these items. The jury returned a general verdict awarding Webco $1,115,500, an amount exceeding the $1,065,507 sum of the purchase price and the interest paid on the purchase price. Thus, as Thermatool's argument recognizes, the jury's damage award reveals that it found Thermatool had breached its duty to rectify the problems with the machine and accordingly gave Webco some amount of out-of-pocket expenses as

-17-

directed in the court's damages instruction.[5]

Thermatool contends that the performance guarantee limited Webco's remedies to either repair of the problems or return of the purchase price, and that because this remedy did not fail in its essential purpose, Webco may not recover consequential damages. Under Michigan's version of the UCC, "[w]here circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act." MICH. COMP. LAWS ANN. § 440.2719(2) (West 2000). In applying this provision, the Michigan Court of Appeals stated:

> the parties to a sales agreement may agree to limit remedies and damages for breach of the agreement. However, subsection (2) further provides that where the limited remedy fails in its purpose or operates to deprive either party of the value of the bargain, the parties may pursue other remedies provided elsewhere in the U.C.C.

*Kelynack v. Yamaha Motor Corp, USA,* 394 N.W.2d 17, 19-20 (Mich. Ct. App. 1986) (per curiam); *see also Krupp PM Eng'g, Inc. v. Honeywell, Inc.*, 530 N.W.2d 146, 149 (Mich. Ct. App. 1995) (notwithstanding a valid limitation of liability in warranty, buyer may pursue other remedies where seller delays completing promised repairs or replacements).

---

[5] Under one possible explanation for the amount of the jury's award, the jury could have given Webco the purchase price of $735,000, $211,000 as the cost of the materials incurred by Webco, and $169,500 as half the cost of the labor charges incurred, and no interest, for a total of $1,115,500. Indeed, the evidence shows that, at one point, Webco offered to pay for half of the repairs.

-18-

The performance guarantee in this case stated that "if the cutoff system fails to meet [Webco's] specifications, Thermatool will make every effort to rectify the problems or take back the cutoff and remit monies paid to Thermatool to that point." Aplt. App. vol. III at 785. The jury apparently found that Thermatool did not make every effort to correct the machine's problems. Moreover, it is undisputed that Thermatool never offered to take back the machine and refund the purchase price. Indeed, at one point it wanted Webco to pay the entire cost of bringing the machine into compliance with the marking specification, and ultimately accepted Webco's offer to pay half. It is also undisputed that Thermatool did not rectify the problems even after Webco agreed to pay half the cost, that Webco tried for several years to run the mill using the IPM, and that the machine never operated within the agreed marking specification.

We look to Michigan law to determine whether these facts demonstrate that the performance guarantee failed in its essential purpose and therefore support the jury's award of damages in excess of the purchase price. In *Krupp*, the buyer received an invoice on parts to repair a commercial furnace. The invoice stated that the buyer's remedy would be limited to a twelve-month warranty and that the seller would not be liable for consequential damages. The court held that

> because plaintiff [buyer] was deprived of its furnace for eighteen
> months and the furnace was not completely fixed for three years, the

-19-

> warranty failed in its essential purpose. Even where a valid
> limitation of liability in a warranty exists, a buyer is entitled to
> pursue other remedies where the seller takes too long to complete the
> repairs or replacements promised in the warranty.

*Krupp*, 530 N.W.2d at 149 (citation omitted).

In so holding the court in *Krupp* relied on *King v. Taylor Chrysler-Plymouth, Inc.*, 457 N.W.2d 42 (Mich. Ct. App. 1990), and *Kelynack*, 394 N.W.2d 17. In *King*, the buyer purchased a car, represented as a demonstration vehicle, that came with a limited warranty excluding incidental and consequential damages. The buyer began to have problems with the car immediately after delivery and took it in for service eight times before she stopped driving it less than a year later. Although some of the problems were repaired, a stalling problem was never corrected. In holding that the warranty failed in its essential purpose, the court observed that the "plaintiff took the car to defendant for repair of the stalling problem seven times over a period of nine months. The repairs were unsuccessful and, as a result, plaintiff became fearful of driving the car." *Id.* at 46. The court pointed out that the seller must repair or replace the defective condition within a reasonable time and had failed to do so, entitling the plaintiff to seek consequential damages notwithstanding the limited warranty.

In *Kelynack*, the plaintiff purchased a motorcycle with a limited six-month warranty providing for repair or replacement. While the vehicle was still under warranty, it developed problems and the buyer took it to the dealer for service.

When the dealer had not repaired the motorcycle two months later, the buyer stopped paying on it and learned for the first time that the engine was seriously damaged. The motorcycle was ultimately repaired over three months after the original purchase and the buyer attempted to revoke the contract on the ground that the repairs had not been made within a reasonable time. The court held that the limited warranty had failed in its essential purpose and the buyer was entitled to pursue other remedies. The court noted that the "plaintiff had the motorcycle in his possession for only ten weeks before it became totally inoperable. He immediately returned it to the dealer where it remained for over three months. By the time the motorcycle was returned to him, it was late November and the weather precluded its use." *Kelynack*, 394 N.W.2d. at 20. The court held that "[w]here a manufacturer or dealer has limited its obligation under the sales agreement to repair or replace defective parts the seller does not have an unlimited time to make the repairs, but rather must repair or replace the parts within a reasonable time." *Id.*

Finally, in *Bosway Tube & Steel Corp. v. McKay Mach. Co.*, 237 N.W.2d 488 (Mich. Ct. App. 1976), the court addressed circumstances very similar to those before us. The plaintiff had purchased a mill for producing tube which did not perform properly. After both the buyer and the seller had expended funds for a year in attempted repairs, the seller stopped making repairs although the mill

was still not producing the required product. The buyer then sold the machine and brought suit. The court rejected the seller's argument that the buyer's damages were limited by a clause restricting the seller's liability to repair or replacement, holding that the warranty failed in its essential purpose because several defects were never corrected by the seller. *Id.* at 430.

Thermatool contends these Michigan cases are inapposite because they concern "repair or replacement" warranties and in this case Thermatool offered a performance guarantee coupled with a refund of the purchase price. Thermatool has not explained why this difference is material and has offered nothing to indicate that Michigan courts would consider such a distinction dispositive. We are not convinced that, with respect to the issue of failure of essential purpose, a warranty limiting remedies to repair or replacement is materially distinguishable from one limiting remedies to repair or refund of the purchase price. Accordingly we are persuaded that whether the seller is obligated to repair or replace, or repair and refund, Michigan law requires the seller do so within a reasonable time under the nature and circumstances of the case. In our judgment, the cited cases describing the reasonableness requirement under Michigan law clearly indicate that the requirement was not met by Thermatool here.[6] We therefore conclude

---

[6] Thermatool notes that in a majority of jurisdictions, when a warranty fails a separate provision barring consequential damages will survive if it is not

(continued...)

that the district court did not err in allowing Webco to recover as consequential damages an amount in excess of the purchase price.

## IV

## ATTORNEYS' FEES

After judgment on the jury verdict was entered, Webco brought a motion for attorneys' fees claiming Michigan law allowed the award as part of Webco's consequential damages. In support of its argument, Webco cited two decisions by the Michigan Court of Appeals holding a court has discretion under Michigan's version of the UCC to award attorneys' fees as an element of consequential damages. *See Kelynack*, 394 N.W.2d 17; *Cady v. Dick Loehr's, Inc.*, 299 N.W.2d 69 (Mich. Ct. App. 1980). The district court denied Webco's motion, relying on an unpublished Sixth Circuit opinion concluding that the Michigan Supreme Court would not agree with the state court of appeals decisions on the matter. *See Olbrys v. Peterson Boat Works, Inc.*, Nos. 94-2016, 94-2070, 1996 WL 143466

---

[6](...continued)
unconscionable. Michigan law, however, is to the contrary. In *Kelynack v. Yamaha Motor Corp., USA*, 394 N.W.2d 17 (Mich. Ct. App. 1986), the court acknowledged the conflicting opinions on this issue and agreed "with those jurisdictions which have held that the failure of an exclusive remedy provision contained in a warranty renders the limitation of damages inoperable. In our view, the repair and replace remedy and the exclusion of consequential damages are integral and interdependent parts of the warranty . . . ." *Id.* at 21.

(6th Cir. Mar. 28, 1996) (per curiam). Alternatively, the district court ruled that even if fees were recoverable, they were an element of damages to be proven at trial and under FED. R. CIV. P. 54(d)(2)(A) could not be recovered as costs.

In *Cady*, the Michigan Court of Appeals reviewed a trial judge's decision awarding the plaintiff attorneys' fees in a breach of warranty claim. The plaintiff argued on appeal that he was entitled to fees under MICH. COMP. LAWS ANN. §§ 440.2714 and 440.2715 (West 2000), the Michigan UCC provisions allowing the recovery of consequential damages. The court recognized the general rule that fees are not ordinarily recoverable as costs or awarded absent statutory authority, and that the matter was an issue of first impression in Michigan. Nonetheless, the court held that the language of the statutes "confers on the trial court discretion to award attorneys' fees as an element of the damages incurred as a result of a breach of warranty." *Cady*, 299 N.W.2d at 72.

In *Kelynack*, as we discussed in Part III.B. supra, the Michigan Court of Appeals held that the limited warranty at issue failed in its essential purpose and that the plaintiff was therefore entitled to pursue other remedies available under the UCC. The trial judge had awarded attorneys' fees and the defendant argued on appeal that the court abused its discretion in so doing because the warranty excluded consequential damages. The court of appeals disagreed, concluding that the failure of the exclusive remedy in the warranty rendered the limitation

-24-

inoperable and that the trial court had not abused its discretion in awarding the fees as consequential damages under the circumstances. *See Kelynack*, 394 N.W.2d at 21.

The district court here declined to follow these two court of appeals decisions, persuaded by the Sixth Circuit that the Michigan Supreme Court would disagree with them. This court has long held that "where jurisdiction rests solely on diversity of citizenship and there is no controlling decision by the highest court of a state, a decision by an intermediate court should be followed by the Federal court, absent . . . convincing evidence that the highest court of the state would decide otherwise." *B.F. Goodrich Co. v. Hammond*, 269 F.2d 501, 505 (10th Cir. 1959) (citing *West v. A.T. & T. Co.*, 311 U.S. 223, 237 (1940)); *see also Lowell Staats Mining Co. v. Pioneer Uravan, Inc.*, 878 F.2d 1259, 1269 (10th Cir. 1989) (citing same). As our court has recognized, "[w]here an intermediate appellate state court rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Hicks ex rel Feiock v. Feiock*, 485 U.S. 624, 630 n.3 (1988) (quoting *West*, 311 U.S. at 237-38).

In *Olbrys*, the Sixth Circuit concluded the Michigan Supreme Court would reject the court of appeals decisions allowing attorney's fees as an element of

consequential damages under Michigan's version of the UCC. The circuit based its conclusion on the general rule that fees are not recoverable as an element of damages and that section 440.2715, the Michigan UCC provision on consequential damages, is silent as to fees. The court also found important the fact that the Michigan court of appeals decisions conflict with the decisions of the highest courts in other states.

The court in *Cady* recognized the general rule that fees are ordinarily not recoverable as costs and most often will not be awarded absent statutory authority, but nonetheless concluded that they could be included as incidental damages under the UCC. *See Cady*, 299 N.W.2d at 71. In so doing, the court looked to decisions in which it had held that a provision in the Michigan Environmental Protection Act (MEPA) stating that costs could be apportioned to the parties "if the interests of justice so required" gave the trial judge discretion to grant attorneys' fees. *See id.* at 71-72.

In our view, this is the unusual case in which persuasive data convinces us the Michigan Supreme Court would not agree with the court of appeals decisions allowing an award of attorneys' fees as an element of incidental damages under section 440.2714 of the Michigan UCC. In addition to the evidence relied upon by the Sixth Circuit in *Olbrys*, we find compelling the Michigan Supreme Court's discussion in *Nemeth v. Abonmarche Dev., Inc.*, 576 N.W. 2d 641 (Mich. 1998).

There the court addressed whether the language in the MEPA providing that costs could be apportioned to the parties in the interest of justice permits a trial judge to apportion attorneys' fees. This is the same language the *Cady* court relied on in its analysis. In concluding that this language did not permit an award of fees, the Michigan Supreme Court pointed out that Michigan follows the common law tradition providing that attorneys' fees are not recoverable unless a statute, court rule, or common-law exception provides to the contrary. *Id.* at 651. The court found persuasive the Supreme Court's analysis in *Alyeska Pipeline Serv. Co. v. Wilderness Soc.*, 421 U.S. 240, 245 (1975), applying the traditional rule against the nonstatutory allowance of attorneys' fees even when a fee award would further a particular public policy. The Michigan Supreme Court stated that the analysis in *Alyeska* comports with its view that selecting the occasions when an award of fees is appropriate is the prerogative of the legislature and not of the courts. *Nemeth*, 576 N.W.2d at 653-54.

In view of the Michigan Supreme Court's emphatic statement that fees may not be allowed absent statutory authority, even when compelling public policy reasons are advanced to support such an award, we must conclude that court would disagree with the nonstatutory award of fees under the UCC. Accordingly, we affirm the district court's decision denying Webco's request for fees in this

case.[7]

## V.

## PREJUDGMENT INTEREST

Webco filed a post-trial motion for taxation of prejudgment interest, claiming that under Michigan law interest should be awarded at a rate of 12% per annum. The district court denied the motion, concluding that "the question of interest on the award was submitted to the jury and therefore, that an award of additional statutory interest to Webco would constitute an impermissible double recovery." Aplt. App. vol. II at 766.

On appeal, Webco maintains that in light of the evidence presented to the jury, no double recovery could have occurred. At trial Webco presented evidence that it paid $735,000 to Thermatool for the machine and an additional $330,507 in financing charges. It also established that it paid $211,000 in supplies and $339,000 in manpower in an effort to repair the problems with the operation of the machine, plus financing charges of $247,318 on those expenses. Webco contends that prejudgment interest on the entire damages award is mandated by Michigan law in addition to any financing charges the jury may have awarded it

---

[7] We therefore need not address the district court's alternative ruling refusing to award fees under FED. R. CIV. P. 54(d)(2)(A).

-28-

as part of its compensatory damages. Thermatool responds that prejudgment interest under the Michigan statute invoked by Webco is a procedural provision not applicable in federal court and that the claim for prejudgment interest is an impermissible request for additur. Thermatool further argues that because the jury was permitted to award interest, and because this court may not speculate on the components of the jury's general verdict, the district court was correct in concluding that granting prejudgment interest post-trial would amount to impermissible double recovery.

Thermatool's first two arguments may be dismissed summarily. It is beyond argument that "prejudgment interest traditionally has been considered part of the compensation due plaintiff." *Osterneck v. Ernst & Whinney,* 489 U.S. 169, 175 (1989). "'Prejudgment interest is normally designed to make the plaintiff whole and is part of the actual damages sought to be recovered.'" *Johnson v. Continental Airlines Corp.*, 964 F.2d 1059, 1062-63 (10th Cir. 1992) (quoting *Monessen S.W. Ry. v. Morgan*, 486 U.S. 330, 335 (1988), and citing cases). Prejudgment interest in a diversity action is thus a substantive matter governed by state law. *See Erie R.R. v. Thompkins*, 304 U.S. 64, 78 (1938).

We are likewise not persuaded by Thermatool's contention that if the award of prejudgment interest is a substantive matter, it would constitute an impermissible additur to include it subsequent to the jury's award of damages.

Thermatool appears to assert that prejudgment interest in a diversity case must be presented to the jury and cannot be the subject of a post-trial motion. The law, however, is to the contrary. As the Supreme Court made clear in a case involving a jury, "a postjudgment motion for discretionary prejudgment interest constitutes a motion to alter or amend the judgment under Rule 59(e)." *Osterneck*, 489 U.S. at 175. *See also id.* at 176 n.3 (same when prejudgment interest is available as matter of right); *Capstick v. Allstate Ins. Co.*, 998 F.2d 810, 812-13 (10th Cir. 1993) (prejudgment interest is part of merits and should be sought by Rule 59(e) motion). These cases and those to which they cite leave no room for the argument that granting such a motion would result in impermissible additur.[8]

We turn to the district court's ruling that an award of prejudgment interest in this case would result in an impermissible double recovery. Michigan provides by statute for the recovery of interest on a money judgment in a civil action, *see* MICH. COMP. LAWS ANN. § 600.6013(1) (West 2000), to be calculated from the date the complaint is filed to the date the judgment is satisfied at the rate of 12% per year, *id.* § 6013(5). The Michigan courts have distinguished between interest paid on the total judgment under the above statute and "interest as an item of damages or loss that is related to a substantive claim." *Sullivan Indus., Inc. v.*

---

[8] As authority for its argument, Thermatool cites only to *Dimick v. Schiedt*, 393 U.S. 474 (1935), a case that did not address the award of prejudgment interest.

*Double Seal Glass Co.*, 480 N.W.2d 623, 633 (Mich. Ct. App. 1992). Both types

of interest are recoverable under Michigan law upon a proper showing by a

plaintiff.

> The purpose of an award of prejudgment interest is "to compensate the prevailing party for the expenses incurred in bringing an action and for the delay in receiving money damages." However, interest as an item of damages is generally interest incurred and paid by a plaintiff as a result of additional borrowings made necessary by a defendant's breach of a contract. It is recoverable in Michigan, in addition to prejudgment interest, under general principles governing damages where the seller had reason to know of the borrowing, or where the parties could reasonably foresee the additional interest incurred as potential loss in event of the breach at the time the contract was made.
>    Interest paid on loans taken out to maintain the business, if foreseeable, falls within the category of consequential damages as prescribed by the U.C.C.

*Id.* (citations omitted).

Thermatool contends awarding prejudgment interest after the jury returned

its verdict would allow Webco to "double dip" in light of the jury instruction

given on damages. However, a careful review of the trial transcript convinces us

that granting Webco's posttrial motion for prejudgment interest would not result

in an impermissible double recovery.

It is true that the damage instruction given to the jury stated it could award

interest either on the amount of the purchase price or on the amount of out-of-

pocket expenses, or both. *See* Aplt. App. vol. II, at 648. But the jury was not

instructed with respect to the award of prejudgment interest in accordance with

-31-

the applicable Michigan statute. Significantly, the jury was also instructed several times that its "decision in this case must be made solely on the evidence presented at the trial." *Id.* at 624. *See also id.* at 627 ("[y]ou should consider only the evidence"); *id.* at 628 ("it is your duty to determine the facts, and in so doing you must consider only the evidence admitted in the case").

The only evidence presented by either party addressed to interest was that presented by Webco. As we have mentioned, Webco presented evidence only with respect to the interest it paid as financing charges on the machine itself and as financing charges on the manpower and material used in its attempt to correct the machine's operating deficiencies, both of which went to the total cost to Webco of purchasing the machine and making the repairs and were therefore part of Webco's compensatory damages. The jury was given no evidence pertaining to the award of statutory prejudgment interest on the total amount of its award.

In sum, the jury was not instructed with respect to the award of statutory prejudgment interest on the judgment as a whole, was instructed to base its verdict only on the evidence, and was presented with no evidence to support an award of statutory prejudgment interest. Under these circumstances there is no possibility the jury included in its verdict any amount attributable to statutory prejudgment interest. Consequently, we reverse the district court's denial of Webco's posttrial motion for prejudgment interest under Michigan law and

remand this matter for further proceedings.

The judgment of the district court is **AFFIRMED** in part, **REVERSED** in part, and **REMANDED** for further proceedings in accordance with this opinion.