**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 17, 2025**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

PERRY CLINE, on behalf of himself
and all others similarly situated,

     Plaintiff - Appellee,

v.

SUNOCO, INC. (R&M); SUNOCO
PARTNERS MARKETING &
TERMINALS L.P.,

     Defendants - Appellants.

----------------------------

CHAMBER OF COMMERCE OF
THE UNITED STATES OF
AMERICA; ROYALTY OWNER
COALITION OF OKLAHOMA, INC.,

     Amici Curiae.

No. 23-7090

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:17-CV-00313-JAG)**

_____

Erin E. Murphy, Clement & Murphy, PLLC, Alexandria, Virginia (Paul D.
Clement and Matthew D. Rowen; R. Paul Yetter and Robert D. Woods, Yetter
Coleman LLP, Houston, Texas; and Daniel M. McClure, Norton Rose Fulbright
US LLP, Houston, Texas, with him on the briefs) for Defendants-Appellants.

Russell S. Post, Beck Redden LLP, Houston, Texas (Owen J. McGovern and Bennett J. Ostdiek; and Bradley E. Beckworth, Jeffrey Angelovich, and Andrew Pate, Nix Patterson, LLP, Austin, Texas, with him on the brief) for Plaintiff-Appellee.

Ryan K. Wilson and Reagan E. Bradford, Bradford & Wilson PLLC, Oklahoma City, Oklahoma, filed an amicus curiae brief for Royalty Owner Coalition of Oklahoma Inc.

Michael Francisco and Francis J. Aul, McGuireWoods LLP, Washington, District of Columbia; Jennifer B. Dickey, U.S. Chamber Litigation Center, Washington, District of Columbia, filed an amicus curiae brief for The Chamber of Commerce of the United States of America.

_____

Before **MATHESON**, **MORITZ**, and **FEDERICO**, Circuit Judges.

_____

**FEDERICO**, Circuit Judge.

_____

This appeal arises from a dispute over oil proceeds and a class action bench trial in Oklahoma. It centered on class-wide violations of Oklahoma's Production Revenue Standards Act (PRSA), Okla. Stat. Ann. tit. 52, §§ 70.1–570.15. The PRSA imposes strict timeframes on when a "first purchaser or holder of proceeds" of crude oil from an Oklahoma well must distribute proceeds to royalty interest or working interest owners entitled to payments. *Cline v. Sunoco, Inc. (R&M)*, 479 F. Supp. 3d 1148, 1157 (E.D. Okla. 2020) (*Cline II*)**.** If the proceeds payments arrive late, the PRSA mandates that these payments must include statutory interest, at a default rate of 12 percent. *Id.*

2

The named plaintiff and class representative, Perry Cline, is an Oklahoma farmer and landowner who owns royalty interests in three Oklahoma oil wells. *Id.* at 1159. In 2017, Cline filed a class action lawsuit against Sunoco, Inc. (R&M), and Sunoco Partners Marketing & Terminals, L.P. (collectively, Sunoco). *Id.* at 1155. He sought to represent all owners who received late payments from Sunoco without the PRSA-required interest. *Id.* Under the PRSA, an "[o]wner" is "a person or governmental entity with a legal interest in the mineral acreage under a well which entitles that person or entity to oil or gas production or the proceeds or revenues therefrom[.]" Okla. Stat. Ann. tit. 52, § 570.2. The class definition setting forth the members of the class included all "owners" of mineral interests who received late payments from Sunoco. *See Cline v. Sunoco, Inc. (R&M)*, 333 F.R.D. 676, 681–82 (E.D. Okla. 2019) (*Cline I*) (defining the certified class); *see id.* at 681 n.1 (discussing class definition).

In 2019, the district court certified this class. Relevant to this appeal, Cline's lawsuit asserted two state law claims for relief: violation of the PRSA and common law fraud. *Id.* at 681.

In 2020, after a four-day bench trial, the district court ruled for the Class on the PRSA claim and for Sunoco on the fraud claim. The Class of over 53,000 owners was awarded damages for over $1.5 million late proceeds payments that failed to include the 12 percent rate of interest.

3

*Cline II*, 479 F. Supp. 3d at 1164, 1176–77. The judgment totaled over $103 million in actual damages (which included additional prejudgment interest that accrued post-trial) and $75 million in punitive damages.

Before this appeal, Sunoco filed a string of appeals that we dismissed. We accepted Sunoco's last appeal preceding this one, however, because the district court's initial allocation of damages failed to provide adequate instructions regarding two undivided accounts for owners whom Sunoco could not locate. *Cline v. Sunoco, Inc. (R&M)*, No. 22-7018, 2023 WL 4946312, at \*6–8 (10th Cir. Aug. 3, 2023) (*Cline III*). On remand, the district court corrected those issues in an amended plan of allocation order and an updated damages order. Together, these orders instructed the settlement administrator regarding the amount of damages to pay each class member, including class members who could not be identified and whose payments were sent to state unclaimed property funds.

After finalizing the total damages awarded to the Class, the district court entered final judgment. We therefore have jurisdiction under 28 U.S.C. § 1291. We affirm much of the district court's findings and rulings, however, we reverse on one issue, punitive damages.

# I

We begin by discussing the PRSA, including its text, legislative history, and application to Sunoco. We then discuss this case's procedural history as it informs the issues raised on appeal.

## A

The Oklahoma Legislature enacted the PRSA in 1980 to "regulate[] the marketing, sale, and production of hydrocarbons from Oklahoma wells." *H.B. Krug v. Helmerich & Payne, Inc.*, 362 P.3d 205, 211 (Okla. 2015). The PRSA "generally applies to all owners and all producing wells in Oklahoma with certain exceptions[,]" defining the duties and requirements for "proceed sharing" and "royalty disbursement" to those who own interests in such wells. *Id.*

The PRSA was passed to stop the industry practice of delaying proceeds payments from the sale of oil and gas to royalty owners. *See id.* at 214. Originally, the PRSA's 12 percent statutory interest rate for late payments was punitive. But in 1985, the Oklahoma Legislature "removed the phrase 'as a penalty' from the statute[.]" *Purcell v. Santa Fe Mins., Inc.*, 961 P.2d 188, 193 (Okla. 1998). That means the PRSA is no longer a punitive statute, and the 12 percent interest rate is held to be "incorporate[d] . . . into the contractual arrangements" among the parties. *Id.* at 194. "The obvious overriding purpose of the [PRSA] is to ensure that

royalty owners are timely paid their share of the proceeds." *H.B. Krug*, 362 P.3d at 214. And when interpreting the PRSA, the Oklahoma "Legislature has followed a path of strengthening mineral owners['] rights since the Act's inception." *Id.*

The PRSA sets forth a specific timetable of when proceeds payments to owners must occur: within six months from the date of the first sale and within two months of any subsequent sales. Okla. Stat. Ann. tit. 52, § 570.10(B)(1). Subject to a marketable title exception – an exception that allows a delay or suspension in proceeds payments if there is a legitimate question over an owner's marketable title*, see Base v. Devon Energy Prod. Co.*, 563 P.3d 934, 954 (Okla. 2024) – statutory interest must be added to any late proceeds payment. § 570.10(D)(1). Relevant here, the statutory interest rate is 12 percent or, if marketable title is legitimately in question, 6 percent for payments before 2018 (and a lower rate after 2018). § 570.10(D)(2). This statutory interest "shall" be "compounded annually . . . until the day paid." § 570.10(D)(1). In other words, the PRSA sets a default 12 percent interest rate subject to the marketable title exception:

> D.1. *Except as otherwise provided in paragraph 2*[,] . . . that portion not timely paid *shall* earn interest at the rate of twelve percent (12%) per annum *to be compounded annually*, calculated from the end of the month in which such production is sold *until the day paid*.

6

> 2.a. Where such proceeds are not paid because the title thereto is *not marketable*, such proceeds shall earn interest at the rate of (i) six percent (6%) per annum[.]

§ 570.10(D)(1), (2)(a) (emphases added).

Although the PRSA applies to both crude oil and natural gas wells in Oklahoma, this case involves only the purchase of oil. Sunoco buys oil extracted from Oklahoma wells, making it a "first purchaser" under the PRSA, but "Sunoco is not itself an oil and gas producer and does not have leases with individual landowners." *Cline II*, 479 F. Supp. 3d at 1157–58. Instead, the "'operators' typically extract the oil from the ground and, pursuant to contracts, convey it to Sunoco. Sunoco then pays owners their

proceeds directly."[1] *Id.* at 1158–59 (footnote omitted). In addition, Sunoco signs contracts with thousands of oil producers in Oklahoma to purchase their oil, and it "has paid over 100,000 well owners royalty proceeds for oil and gas production from over 20,000 properties since 2006." *Cline I*, 333 F.R.D. at 681.

---

[1] Numerous players are involved, including royalty owners (like Cline), working interest owners, operators, and first purchasers (like Sunoco), among others:

> Oil production has a cast of varied characters. When someone (such as Cline) owns land that may have oil on it, an exploration and production ("E&P") company leases the land to drill for and extract the oil. The E&P company agrees to split the proceeds from the sale of that oil with the landowner if the company can extract it. Usually, the landowner gets at least a one-eighth royalty and bears no costs or risk associated with drilling the well or cleaning and closing a dry hole. The E&P company partners with other industry players, known as working interest owners, to drill the well, and they split the remaining interest. One of the working interest owners is deemed the "operator." The operator "frequently ha[s] either a majority interest, or [it is] elected because [it is] knowledgeable and the other working interest owners respect [it]." The working interest owner with the largest share of the interest performs and coordinates the work, with the remaining companies sharing in the cost and risk. After the working interest owners extract the oil, companies such as Sunoco will enter into contracts with the operators to transport and market the oil. The landowner's interest may fracture over time, such as when a landowner dies or sells the interest to another individual or entity. Thus, it is not unusual for Sunoco to pay anywhere from tens to thousands of interest owners for oil produced from a well.

*Cline v. Sunoco, Inc. (R&M)*, 479 F. Supp. 3d 1148, 1158 n.6 (E.D. Okla. 2020) (*Cline II*) (alterations in original) (internal citations omitted).

**B**

Cline filed this lawsuit against Sunoco in Oklahoma state court in 2017. *Cline II*, 479 F. Supp. 3d at 1155. Sunoco removed the lawsuit to the United States District Court for the Eastern District of Oklahoma. *Id.* "The case moved along slowly" until June 2019, when Cline moved for class certification. *Id.* Cline argued that because Sunoco uniformly failed to pay the statutory interest it owed under the PRSA on late proceeds payments for all wells in Oklahoma, the Class should be certified based on Sunoco's uniform duty and breach under the PRSA to all 53,000 class members. *See id.* at 1155–56. The district court granted class certification in October 2019, citing four common questions in support:

(1)  whether, under Oklahoma law, Sunoco owed interest to Plaintiff and the Class on any and all Untimely Payments;

(2)  whether owners must make a demand prior to being entitled to receive statutory interest;

(3)  whether Sunoco's failure to pay interest to Plaintiff and the putative class on any Untimely Payments constitutes a violation of the PRSA; and

(4)  whether Sunoco defrauded Plaintiff and the putative class by knowingly withholding statutory interest [as applied to Count II (fraud) of the original petition].

*Cline I*, 333 F.R.D. at 683 (alteration in original).

On October 3, 2019, the district court certified both the PRSA claim and the fraud claim. *Id.* at 681, 688. In the class certification decision, the

district court rigorously analyzed each of the factors in Federal Rule of Civil Procedure 23. *Id.* at 682–88. The testimony and damages model of Cline's expert, Barbara Ley, "establish[ed] that Cline [could] identify the putative class members and calculate damages class-wide with common proof." *Id.* at 681 n.3. Citing our decision in *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 798 (10th Cir. 2019), the district court advised that it could "later divide the class into subclasses to determine damages, or amend or alter its class certification order, if necessary." *Cline I*, 333 F.R.D. at 686 n.9.

Regarding class certification of the fraud claim, Sunoco argued that individualized questions on each owner's reliance on Sunoco's statements precluded class certification. *Id.* at 686. But as the district court explained, "[c]ourts will certify fraud claims . . . when the law of one state applies to the majority of the claims and the check stubs sent to royalty owners 'presented . . . a standardized, written representation.'" *Id.* at 687 (quoting *Rhea v. Apache Corp.*, No. CIV-14-0433-JH, 2019 WL 1548909, at *9 (E.D. Okla. Feb. 15, 2019)). And it held that Cline could "establish fraud through the check stubs Sunoco issued uniformly to the putative class members." *Id.*

Sunoco also claimed that not all members of the Class could be identified, and thus were not ascertainable. But the Class's damages "model provides a reliable and administratively feasible mechanism for

determining class membership." *Id.* at 688. Ultimately, using the revised class definition set forth in Cline's reply brief, the district court granted class certification,[2] defining the Class as:

> All non-excluded persons or entities who: (1) received Untimely Payments from Defendants (or Defendants' designees) for oil proceeds from Oklahoma wells and (2) who have not already been paid statutory interest on the Untimely Payments. An "Untimely Payment" for purposes of this class definition means payment of proceeds from the sale of oil production from an oil and gas well after the statutory periods identified in O[kla]. S[tat]. tit 52, § 570.10(B)(1) (i.e., commencing not later than six (6) months after the date of first sale, and thereafter not later than the last day of the second succeeding month after the end of the month within which such production is sold). Untimely Payments do not include: (a) payments of proceeds to an owner under O[kla]. S[tat]. tit 52, § 570.10(B)(3) (minimum pay); (b) prior period adjustments; or (c) pass-through payments.

*Id.* at 681–82 (alterations in original).

Pointing to the two years the case had languished, the district court set the discovery cutoff as October 18, 2019, and the trial date as December 16, 2019. *Cline II*, 479 F. Supp. 3d at 1156.

On December 10, 2019, the district court granted the Class's partial motion for summary judgment on class-wide liability for the PRSA claim. It held that the PRSA requires Sunoco to include statutory interest

---

[2] Cline's "revisions provide[d] a more narrow and manageable definition[.]" *Cline I*, 333 F.R.D. at 681 n.4. Because of a statute of limitations argument, the class definition was limited to a five-year period of late payments. *Id.* at 687.

11

automatically every time it makes a late proceeds payment. Sunoco had

admitted that it did not add interest to late payments unless specifically

requested, which seldom happened. Class-wide partial summary judgment

established Sunoco's liability under the PRSA to every class member.

On December 16, 2019, the Class proceeded to a class action bench

trial on both claims for relief. The trial established that Sunoco was already

making proceeds payments to the members of the Class. Sunoco's corporate

representative, Eric Koelling, agreed that Sunoco had "already sent"

"principal proceeds owed to every class member directly, or to an unclaimed

property fund[,]" and that "there is no issue" that each class member had "a

right to be paid their principal proceeds[.]" Aple. App. IV at 18.

The Class also offered a class-wide damages expert and damages

model to prove that the actual damages owed can be – and, in fact, already

have been – allocated to each class member:

> To prove the precise amount due, Cline relied on the expert
> testimony of Barbara Ley, a certified public accountant who has
> extensive experience with accounting in the oil and gas
> industry. Ley testified credibly, and described a thorough and
> defensible method of calculating the amount due from Sunoco.
> Ley received information from Sunoco to create a database of
> individual owner information and to determine whether each
> payment was late based on that data. Sunoco's data identifies
> the date proceeds were sold, the date Sunoco paid proceeds to
> an owner, and the amount of the proceeds. To the extent she
> could, Ley checked the sale date against public records. She also
> reviewed depositions and other documents produced in the case,
> and was present in the courtroom during the majority of the

12

trial. Sunoco agrees that Ley's data reliably reflects the sale date, payment date, and amount of proceeds.

*Cline II*, 479 F. Supp. 3d at 1161 (citations omitted).

In August 2020, the district court struck Sunoco's damages expert, Eric Krause. His report was untimely and, according to the district court, not helpful because it rested upon faulty assumptions. *Id.* at 1165–68. Sunoco does not appeal these rulings. During the bench trial, Sunoco relied exclusively upon the testimony of Krause to challenge Ley and to attack the Class's damages. So, with Krause struck as an expert, Sunoco ultimately defended the class action trial with liability already entered class-wide on the PRSA claim, no damages expert, no damages model, no challenge to Ley's expert damages testimony, and no challenge to Ley's damages model.

On appeal, Sunoco criticizes at length the district court's change of the trial date and the discovery cutoff date. Sunoco, however, does not actually appeal any of the discovery deadlines, the case scheduling order, or the trial date. And the district court made unchallenged, specific factual findings in its trial opinion when it struck Sunoco's damages expert, *id.* at 1167–68, and dismantled Sunoco's critique of the scheduling order, *id.* at 1164. Despite Sunoco blaming the outcome of this case on a "rogue" district court, Sunoco did not file a motion to amend the scheduling order, discovery cutoff date, or trial date. Op. Br. at 57.

Also left unchallenged are the district court's findings that Sunoco and its counsel engaged in litigation obstruction. The district court found that "[w]hen it became clear that the case would move forward, Sunoco adopted a number of tactics to derail the litigation." *Cline II*, 479 F. Supp. 3d at 1156. Sunoco's tactics included (1) "sending Cline an unrequested check for the amount of interest it owed him, and then, nearly two years later, claim[ing] that the tendered check deprived him of standing[,]" (2) filing a baseless motion to clarify the class definition that "merely amounted to an argument to cut down the size of the class[,]" and (3) "after the [c]ourt certified the class (and long after the [c]ourt set a trial date and discovery cutoff)," waiting "to look through thousands of files for evidence of what it might owe." *Id.* at 1156–57.

According to the district court, Sunoco's delays in producing relevant documents resulted in an untimely and prejudicial "production of millions of lines of data to the plaintiff – after the plaintiff's expert report was due, and after the discovery cutoff." *Id.* at 1156. The district court found that "Sunoco characterizes its search for data as heroic; in reality, Sunoco ignored its files for years because it never intended to pay much interest, and let this case sit around for three years without getting its evidence together." *Id.*

14

Before this appeal, Sunoco filed a string of appeals that we dismissed for lack of jurisdiction. In 2023, however, we agreed with Sunoco's latest appeal preceding this one and reversed the district court's damages allocation order. *Cline III,* 2023 WL 4946312, at *6-7. We held that "although the allocation plan provides a formula that will produce individual damage awards for most class members, it will not produce such awards for the group of class members associated with the two undivided accounts." *Id.* at *6. These undivided accounts held the damages awards for class members who could not be identified and located. On remand, the district court issued an amended plan of allocation order that addressed our concerns. Notably, in this appeal, Sunoco does not challenge the amended allocation award.

After resolving post-trial motions, in October 2023, the district court entered an amended award of damages that updated the actual damages awarded to $103,873,002.50. These increased actual damages included the compounded, prejudgment interest that had continued to accrue post-trial.

Final judgment was entered on October 19, 2023, and Sunoco timely appealed.

## II

In this appeal, Sunoco's challenges: (1) class certification, (2) Article III standing of certain class members whose payments went to unclaimed

15

state property funds because Sunoco's records were insufficient to locate them, (3) the prejudgment interest awarded as actual damages to the class, and (4) the punitive damages awarded to the Class. We affirm the district court on the first three issues, but we vacate the punitive damages award.

## A

We start with Sunoco's challenge to the class certification order. We review de novo whether a district court applied the proper legal standard to decide a motion for class certification. *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1173 (10th Cir. 2023). In this case, because the district court rigorously applied each of the Rule 23(a) and (b)(3) factors, our review of the decision granting class certification "is highly deferential." *Naylor Farms*, 923 F.3d at 790–91. We may reverse only for an abuse of discretion, which means that we "must defer to the district court's ruling unless" the class certification "decision falls outside the bounds of rationally available choices given the facts and law involved in the matter at hand." *Id.* at 791 (internal quotation marks omitted).

Class actions in federal court are controlled by Federal Rule of Civil Procedure 23. There are four Rule 23(a) factors that all class actions must satisfy, and, in a case seeking damages under Rule 23(b)(3), two additional factors must be met: predominance and superiority. *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013).

16

The four Rule 23(a) factors are:

1.  [Numerosity:] the class is so numerous that joinder of all members is impracticable;[3]

2.  [Commonality:] there are questions of law or fact common to the class;[4]

3.  [Typicality:] the claims or defenses of the representative parties are typical of the claims or defenses of the class;[5] and

4.  [Adequacy:] the representative parties will fairly and adequately protect the interests of the class.[6]

---

[3] No set threshold exists for the number of class members needed to meet the numerosity factor. Usually, a total of 40 or more class members "raises a presumption of impracticability of joinder based on numbers alone." 1 Newberg and Rubenstein on Class Actions § 3:12 (6th ed. 2025).

[4] "A finding of commonality requires only a single question of law or fact common to the entire class." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 914 (10th Cir. 2018) (quoting *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1195 (10th Cir. 2010)); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 359 (2011) ("We quite agree that for purposes of Rule 23(a)(2) even a single common question will do.") (brackets and internal quotation marks omitted)).

[5] Typicality looks only to confirm that the legal claims for relief are similar; factual variations among the class members do not defeat typicality. *Menocal*, 882 F.3d at 914.

[6] Under Rule 23(a)(4), "[o]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Tennille v. W. Union Co.*, 785 F.3d 422, 430 (10th Cir. 2015) (internal quotation marks omitted). Likewise, Sunoco alleges without support the possibility of intra-class conflicts based on some class members having indemnity agreements, but a "merely speculative or hypothetical" conflict will not defeat the adequacy requirement. *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010) (internal quotation marks omitted).

17

Fed. R. Civ. P. 23(a).

A class action seeking damages must also satisfy Rule 23(b)(3),[7] which requires a plaintiff to show predominance and superiority. Rule 23(b)(3) states that predominance is satisfied if "the court finds that the *questions of law or fact common to class members predominate over any questions affecting only individual members*," and superiority is met if a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphases added).[8]

In challenging class certification, Sunoco contends that (1) individualized issues on each owner's marketable title overwhelm the common issues so predominance is not met, (2) the class members are not ascertainable because not all of them can be identified from Sunoco's

---

[7] In contrast to a Rule 23(b)(3) class action for damages, a class action for injunctive relief is pursued under Rule 23(b)(2), and it does not require predominance or superiority. A plaintiff is allowed to pursue in the same case both injunctive relief under Rule 23(b)(2) and damages under Rule 23(b)(3). *See, e.g.*, *Chicago Tchrs Union, Loc. No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 443 (7th Cir. 2015).

[8] The factors to assess superiority include, but are not limited to: "(A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action." Fed. R. Civ. P. 23(b)(3)(A)–(D).

records, and (3) several unidentified class members lack standing so the class should not have been certified. We address these challenges in turn.

1

Challenging whether the Class met predominance, Sunoco argues that the class is not cohesive and there are too many individualized issues to warrant class certification. *See* Op. Br. at 34 ("There is simply no way to adjudicate on a classwide basis claims dependent on the individualized land-ownership details of each plaintiff.").

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Menocal v. GEO Grp., Inc.*, 882 F.3d 905, 914 (10th Cir. 2018) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)). To apply the predominance factor at class certification, "the district court must determine 'whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1194 (10th Cir. 2023) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). This means a district court first "should '*characterize* the issues in the case as common or not, and then *weigh* which issues predominate.'" *Black*, 69 F.4th at 1175 (quoting *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1087 (10th Cir. 2014)). As we have

emphasized, "[i]t is not necessary that all" the "elements of the claim entail questions of fact and law that are common to the class." *Id.* (quoting *CGC Holding Co.*, 773 F.3d at 1087).

The predominance inquiry "begins 'with the elements of the underlying cause of action.'" *Id.* (quoting *CGC Holding Co.*, 773 F.3d at 1088). In this case, the district court certified claims for violation of the PRSA and common law fraud. The elements of a PRSA violation claim have not been affirmatively stated in a published opinion by an Oklahoma appellate court, but we must construe the PRSA claim here as a breach of contract claim. *See Purcell,* 961 P.2d at 193. A breach of contract claim under Oklahoma law requires "(1) formation of a contract; (2) breach of the contract; and (3) damages as a result of that breach." *Morgan v. State Farm Mut. Auto. Ins. Co.*, 488 P.3d 743, 748 (Okla. 2021); *accord Cline I*, 333 F.R.D. at 684 ("To succeed on his PRSA claims, Cline must show that Sunoco (1) owed Cline payments; (2) made the payments to Cline late; and (3) did not pay the interest on the late payments." (citing *Chieftain Royalty Co. v. Marathon Oil Co.*, No. CIV-17-334-SPS, 2018 WL 2745906, at *2 (E.D. Okla. June 7, 2018))).

Regarding the fraud claim, "fraud is a generic term embracing the multifarious means which human ingenuity can devise so one can get advantage over another by false suggestion or suppression of the truth."

20

*Croslin v. Enerlex, Inc.*, 308 P.3d 1041, 1045 (Okla. 2013). The district court did not identify which type or form of fraud it interpreted Cline's fraud claim to be alleging. Oklahoma recognizes two forms of fraud – actual and constructive – along with similar claims for relief that could apply, such as deceit by nondisclosure. "Actual fraud is the intentional misrepresentation or concealment of a material fact, with an intent to deceive, which substantially affects another person[.]" *Id.* (footnote omitted). And "constructive fraud," which "has the same legal consequence as actual fraud[,]" "is a breach of a legal or equitable duty to the detriment of another, which does not necessarily involve any moral guilt, intent to deceive, or actual dishonesty of purpose." *Id.* at 1045–46.

In line with Oklahoma law on both the PRSA claim and the fraud claim, the district court identified four common and predominant questions that would determine class-wide liability against Sunoco as a matter of law. *Cline I*, 333 F.R.D. at 683. As Cline argued in seeking class certification, "Sunoco's business records and employee testimony will confirm its 'uniform policy of not paying statutory interest unless requested by an owner.'" *Id.* Cline pointed out "that the proposed class will use common evidence of Sunoco's unlawful actions, and that if the Court finds Sunoco had a duty to pay that interest without a request and Sunoco breached that duty, every class member will prevail." *Id.*

21

Predominance hinges on the distinction between common issues and individual issues. "Common issues are those for which 'the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof.'" *Black*, 69 F.4th at 1175 (quoting *Tyson Foods, Inc.*, 577 U.S. at 453) (alteration in original). In contrast, "[i]ndividual issues are those for which 'members of [the] proposed class will need to present evidence that varies from member to member.'" *Id.* (quoting *Tyson Foods, Inc.*, 577 U.S. at 453).

Because of the distinction between common and individualized evidence, we agree that the Class met the Rule 23(b)(3) predominance factor. To show predominance, "[i]t is not necessary that all of the elements of the claim entail questions of fact and law that are common to the class, nor that the answers to those common questions be dispositive." *CGC Holding Co.*, 773 F.3d at 1087. What Rule 23(b)(3) "does require is that common questions '*predominate* over any questions affecting only individual [class] members.'" *Amgen Inc.*, 568 U.S. at 469 (quoting Fed. R. Civ. P. 23(b)(3)). And "Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Id.* at 459.

Thus, Rule 23(b)(3) requires predominance, not perfection, such that "the common, aggregation-enabling, issues in the case are more prevalent

or important than the non-common, aggregation-defeating, individual issues." *Menocal*, 882 F.3d at 914–15 (quoting *CGC Holding Co.*, 773 F.3d at 1087). "Critically, so long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3) – even if there remain individual issues, such as damages, that must be tried separately." *Naylor Farms,* 923 F.3d at 789; *accord* 7AA C. Wright, A. Miller, M. Kane & R. Klonoff, Federal Practice & Procedure § 1778 (3d ed. 2025) ("The common questions need not be dispositive of the entire action. In other words, 'predominate' should not be automatically equated with 'determinative.'" (footnote omitted)).

Key aspects of this class action align with several controlling Tenth Circuit class certification decisions: *In re Urethane Antitrust Litig.*, 768 F.3d 1245 (10th Cir. 2014); *CGC Holding Co.*, 773 F.3d 1076; *Menocal*, 882 F.3d 905; and *Naylor Farms*, 923 F.3d 779. Across these decisions, we emphasized three traits that the Class proved were present here: (1) the defendant used a common or uniform scheme, policy, or practice to target most of the class (or each sub-class); (2) the empirical proof of a class action trial confirmed whether predominance actually existed or whether the class imploded at trial under the force of too many individualized issues; and (3) the predominating issue of a defendant's breach outweighed any individualized issues on damages or other matters.

**a**

First, we start with the principle that predominance is often satisfied when a defendant has implemented a class-wide scheme, policy, or practice.[9] In most of our recent decisions concluding that the predominance factor was satisfied, we have emphasized the legal significance of this showing under Rule 23(b)(3):

- *In re Urethane*, 768 F.3d at 1258–59 (affirming class-wide jury verdict in an antitrust conspiracy case because the defendants' price-fixing scheme created a singular, common issue that predominated over any individualized issues).

- *CGC Holding Co.*, 773 F.3d at 1082, 1091 (affirming class certification of a civil RICO claim based on the defendants' "common scheme to defraud" all investors in a real estate investment offering and a generalized inference of reliance).

- *Menocal*, 882 F.3d at 920 (affirming class certification based on the defendant's uniform policy to coerce all prisoners in its private prison to perform forced labor).

- *Naylor Farms*, 923 F.3d at 782–83 (affirming class certification because the defendant's uniform policy of deducting midstream services from royalty payments created a singular, class-wide issue).

---

[9] A "scheme" and a "policy" are the same thing; a "scheme" is a "policy" that harms the plaintiffs, often by deception or foul play. A "practice" is included to illustrate that even if a defendant denies having a business policy or avoids reducing its business policy to writing, a "practice" functions as a *de facto* "scheme" or "policy." *See, e.g.*, Aplt. App. II at 55 (negating Sunoco's assertion that it did not have a "policy" and merely engaged in a "practice" to not pay interest it owed without receiving a demand). These three terms function the same way, and we use them interchangeably.

When a class action targets a defendant's class-wide policy or practice, the focus at trial necessarily is on the defendant and the common evidence in its documents and business records – not on individual issues that require the individualized testimony of each class member. And as this case confirms, the "predominant question" of a defendant's class-wide liability will, in many cases, "definitively end the litigation." *CGC Holding Co.*, 773 F.3d at 1093 n.11.

The Class successfully demonstrated that Sunoco "engaged in an ongoing scheme to avoid making the required interest payments" by not disclosing its duty to pay interest and only paying interest when specifically requested. *Cline I*, 333 F.R.D. at 681. Sunoco's class-wide scheme made "class-wide proof possible." *Menocal*, 882 F.3d at 920. Sunoco's scheme allowed the district court to grant partial summary judgment on liability to the Class – a class-wide, dispositive ruling for all 53,000 class members that Sunoco does not appeal. To be clear, Sunoco does not appeal the ruling of class-wide liability, only the amount of interest (which, in this case, constitutes the actual damages) it owes to each of the 53,000 members of the Class. Thus, Sunoco's class-wide scheme supplies "the 'glue' that holds together" the Class's claim that Sunoco violated the PRSA and owes statutory interest to every class member. *See Menocal*, 882 F.3d at 920 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 352 (2011)). We thus

affirm the unchallenged factual findings that "[t]he trial testimony established that Sunoco followed a practice of not paying interest until it received a request from an owner[;]" that "Ley created a methodology through which she could calculate class-wide damages based on that conduct[;]" and that Ley's "computer calculations identify the precise damages for each late payment for each owner of each well." *Cline II*, 479 F. Supp. 3d at 1164.

Sunoco primarily relies on *Wal-Mart Stores, Inc. v. Dukes* to argue that class certification was improper. But *Wal-Mart* is less valuable in a Rule 23(b)(3) damages case than Sunoco contends. *See Menocal*, 882 F.3d at 920 n.10 (explaining the limited utility of *Wal-Mart* in a damages class action involving a corporate policy that unifies the class). The *Wal-Mart* plaintiffs alleged "that the discretion exercised by their local supervisors over pay and promotion matters" violated Title VII by discriminating against women. *Wal-Mart*, 564 U.S. at 342. The Ninth Circuit in *Wal-Mart* had approved class certification of "one of the most expansive class actions ever[,]" with a decade-long class period and 1.5 million current and former

26

female employees in all of Wal-Mart's 3,400 stores across America. *Id.*[10] The

Supreme Court reversed the order granting class certification, ruling that

the plaintiffs had not established commonality because the employment

decisions complained of resulted from millions of individual decisions made

by low-level decision-makers who had total, subjective discretion over such

matters. *Id.* at 359–60. As a result of these outlier facts, the class members

"wish[ed] to sue about literally millions of employment decisions at once[,]"

but the class could not be certified "[w]ithout some glue holding the alleged

*reasons* for all those decisions together[.]" *Id.* at 352; *see also id.* at 359

(finding no commonality absent "convincing proof of a companywide

discriminatory pay and promotion policy").

But *Wal-Mart* involved outlier facts, and the class sought nationwide

injunctive relief under Rule 23(b)(2). Given the fact pattern, even the

dissenting Justices agreed that class certification for injunctive relief was

improper under Rule 23(b)(2).[11] The plaintiffs did not target a corporate

---

[10] These plaintiffs "held a multitude of jobs, at different levels of Wal–Mart's hierarchy, for variable lengths of time, in 3,400 stores, sprinkled across 50 states, with a kaleidoscope of supervisors (male and female), subject to a variety of regional policies that all differed[.]" *Wal-Mart,* 564 U.S. at 359–60 (internal quotation marks omitted).

[11] *See Wal-Mart*, 564 U.S. at 367 (Ginsburg, J., dissenting in part and concurring in part) ("The class in this case, I agree with the Court, should not have been certified under Federal Rule of Civil Procedure 23(b)(2).").

27

policy or a series of corporate policies,[12] but rather sought to challenge "literally millions of employment decisions at once." *Id.* at 352.

Those concerns, however, are wholly absent here. Sunoco's uniform, objective policy not to pay interest was devised at the corporate level by its executives and legal counsel as a corporate policy or practice (not by thousands of low-level individual employees). Sunoco's policy did not involve thousands of decision-makers scattered across the 50 states. Equally important, Cline and the Class did not seek injunctive relief under Rule 23(b)(2). As the *Wal-Mart* majority clarified, "[t]he applicability" of the language in Rule 23(b)(3) on predominance was "not before [the Court]." *Id.* at 346 n.2.

The class certification in this case involved a uniform corporate policy and a damages class action pursued under Rule 23(b)(3). Both wide-scale exercise of independent discretion and the Rule 23(b)(2) concerns in *Wal-Mart* are absent. And Rule 23(b)(3) "allows class certification in a much wider set of circumstances but with greater procedural protections." *Id.* at 362.

---

[12] *See id.* at 355 ("The only corporate policy that the plaintiffs' evidence convincingly establishes is Wal–Mart's 'policy' of *allowing discretion* by local supervisors over employment matters.").

28

**b**

Next, we recognize the significance that this class action proceeded to a bench trial and that the allocation of individual damages awards to each of the 53,000 class members is unchallenged. That damages could be – in fact, already were – individually allocated to each of the 53,000 class members proves the Class satisfied the predominance factor. The amended allocation order, which states precisely how much is awarded individually to each class member, is not at issue on appeal.

Typically, our review of class certification is at the Rule 23(f) stage, before summary judgment and long before trial. But here, we do not have to predict whether the common issues of Sunoco's liability will predominate – "we know from the actual trial" that they in fact did. *In re Urethane*, 768 F.3d at 1258–59 (affirming class action trial aggregate damages award totaling nearly $1 billion for antitrust violations). Indeed, "the district court had the benefit of seeing what ultimately took place at trial. The court had no need to make a prediction based on the expert report. Instead, the district court could see that common issues of liability had predominated over individualized issues." *Id.* at 1259.

With the proof generated by the class action trial transcript, the district court's findings disproved Sunoco's challenges to predominance: "The trial testimony established that Sunoco followed a practice of not

paying interest until it received a request from an owner. Ley created a methodology through which she could calculate class-wide damages based on that conduct." *Cline II*, 479 F. Supp. 3d at 1164 (citations omitted). "Further, her computer calculations identify the precise damages for each late payment for each owner of each well." *Id.* We see no reason to disturb the district court's findings.

**c**

Additionally, we conclude that the predominating issue of Sunoco's liability outweighed any individualized issues on damages or other matters. This case aligns with our decision in *Naylor Farms,* a royalty underpayment class action pursued under Oklahoma law. As to our federal class action standards, we explained that, "[c]ritically, so long as at least one common issue predominates, a plaintiff can satisfy Rule 23(b)(3) – even if there remain individual issues, such as damages, that must be tried separately." *Naylor Farms*, 923 F.3d at 789.

Our review of class certification in *Naylor Farms* was at the Rule 23(f) stage, so we had to predict what issues would predominate at trial.[13] That

---

[13] *Naylor Farms*, 923 F.3d at 798 (stating at the Rule 23(f) stage, before trial, that "[w]e see no indication" that individualized issues overwhelming the common issue "will occur here" later at trial). But in this case, with the trial concluded and damages allocated to the Class members, we know with certainty that no individualized issues predominated.

case involved a class of royalty owners who alleged they were charged excess deductions for midstream services applied to natural gas produced from Oklahoma wells in which they had royalty interests. *Id.* The defendant insisted that the variations among gas quality and different lease language made it impossible to certify a cohesive class. *Id.* at 795–96. Similarly, Sunoco here insists there are individualized variations regarding the timing of the interest payments and each owner's marketable title among the Class.

We rejected the defendant's argument in *Naylor Farms*, explaining that a single common issue (the defendant's class-wide breach of lease to each class member) predominated, and that all the defendant's alleged individualized issues were "relevant only to the post-breach question of damages." *Id.* at 790. We reject Sunoco's argument on the same grounds. And because the class plaintiffs in *Naylor Farms* "provided evidence that [their] expert [could] determine damages on a class[-]wide basis through use of a model," we affirmed the district court's ruling that "these distinctions don't defeat predominance." *Id.* (internal quotation marks omitted). We highlighted that the defendant failed to identify any "specific" evidence that showed any actual lease language variations that would create genuine individualized issues and make a class action trial unworkable. *Id.* at 797. All this analysis applies with full force here, and

31

even more so, given that Sunoco's only identified expert on class certification and damages – Krause – was struck (and independently deemed unreliable as an expert).

Sunoco relies on our decision reversing class certification in *Wallace B. Roderick Revocable Living Trust v. XTO Energy, Inc.*, 725 F.3d 1213 (10th Cir. 2013). That case, like *Naylor Farms*, involved alleged royalty underpayments that depended on the language in hundreds of individual leases, but our ruling there was largely driven by the class plaintiffs' basic failure to even review all the leases. *See id.* at 1219 ("[T]here are roughly 430 leases which have yet to be examined[.]"). We did not suggest that the class could never be certified as a matter of law; rather, we said that "[o]n remand" the class plaintiffs "could, for example, create a chart classifying lease types" so that the district court could determine whether the lease language variations were too individualized. *Id.*; *see also Naylor Farms*, 923 F.3d at 795–96 (distinguishing *Roderick* because the royalty owner class plaintiffs created a "generally accurate" lease chart, doing exactly as we suggested in *Roderick* (internal quotation marks omitted)).

As Sunoco argues, we also suggested in *Roderick* that on remand the district court needed to assess "the extent to which material differences in damages determinations will require individualized inquiries." *Roderick*,

32

725 F.3d at 1220. But we continued: "That said, there are ways to preserve the class action model in the face of individualized damages." *Id.*

As a matter of law, individualized damages in class actions typically do not defeat predominance under Rule 23(b)(3). "[T]he black letter rule is that individual damage calculations generally do not defeat a finding that common issues predominate, and courts in every circuit have uniformly held that the 23(b)(3) predominance requirement is satisfied despite the need to make individualized damage determinations." *Brayman v. KeyPoint Gov't Sols., Inc.*, 83 F.4th 823, 839 (10th Cir. 2023) (quoting 2 Newberg and Rubenstein on Class Actions § 4:55); *see also Menocal*, 882 F.3d at 922 (same).

Sunoco primarily challenges predominance by claiming that individualized questions on marketable title (which went only to the amount of damages owed) overwhelmed the common questions on liability. But Sunoco fails to confront the district court's analysis on marketable title or show any legal error.

Because this case is in federal court based on federal diversity jurisdiction under the Class Action Fairness Act (CAFA),[14] "we apply the

---

[14] Sunoco removed this case to federal court under the Class Action Fairness Act of 2005 (CAFA), a sub-section of the diversity jurisdiction statute, 28 U.S.C. § 1332. *See* § 1332(d)(2).

substantive law of the forum state – Oklahoma." *Shotts v. GEICO Gen. Ins. Co.*, 943 F.3d 1304, 1308 n.4 (10th Cir. 2019). To do so, we "must ascertain and apply Oklahoma law with the objective that the result obtained in the federal court should be the result that would be reached in an Oklahoma court." *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 930 (10th Cir. 2018) (quoting *Wood v. Eli Lilly & Co.*, 38 F.3d 510, 512 (10th Cir. 1994)). Thus, when considering the arguments on marketable title, we look to Oklahoma law.

We start by analyzing the factual underpinnings of Sunoco's arguments. Sunoco does not address the district court's findings of fact regarding Sunoco's failure to substantiate its marketable title defense. The district court found that:

- "Sunoco did not identify a single case in which an owner did not have marketable title." *Cline II*, 479 F. Supp. 3d at 1171.

- "Sunoco has never even bothered to figure out how much interest it owes to owners. It keeps scant records of why it made late payments." *Id.* at 1155.

- It was only "after the [c]ourt certified the class (and long after the [c]ourt set a trial date and discovery cutoff)" that "Sunoco finally began to look through thousands of files for evidence of what it might owe." *Id.* at 1156.

- "For its millions of late payments, it says it cannot determine the amount of interest due. This inability, however, does not arise from a lack of information. Rather, it arises from Sunoco's unwillingness to make the effort, at the time of the late payment, to determine the cause of the lateness and the amount of interest due." *Id.* at 1160.

These factual findings undercut Sunoco's marketable title challenge on appeal. Under Oklahoma law, doubts regarding marketable title can be used to suspend or deny proceeds payments to owners "only when a legitimate question as to marketability of title exist[s.]" *Hull v. Sun Refin. & Mktg. Co.*, 789 P.2d 1272, 1277 (Okla. 1989). We explored this issue in *Quinlan v. Koch Oil Co.*, 25 F.3d 936 (10th Cir. 1994), applying Oklahoma law and rejecting an oil producer's defense that a royalty owner seeking relief under the PRSA had to make "a showing of marketable title every time a royalty payment was due." *Id.* at 940. We declined "to read *Hull* as broadly as [the defendant] would have us." *Id.*

35

The parties in this case frame this inquiry as a question of who has the burden of proof on marketable title. We assume, without deciding, that generally each royalty owner has the initial burden to establish marketable title to receive royalty payments under the PRSA, if there are "legitimate questions" on marketable title. But in this case, Sunoco itself had already determined that every member of the Class had marketable title, and it is "implausible that Sunoco paid people money that it did not owe them, especially considering the company's policy of withholding interest payments from their rightful owners in contravention of clear Oklahoma law." *See* Aplt. App. II at 204. Additionally, the definition of the class also ensured that Sunoco would pay damages only to those owners it had already determined were entitled to proceeds payments. *See id.* ("These limitations – narrowing the class to those who have already received untimely payments for oil proceeds but have not received the statutory interest payments – ensure the legal entitlement of each member of the class to interest payments under the PRSA.").

As a result, we "conclude that the marketability of [the Class members'] title was not legitimately in question[,]" and thus we affirm the holding that each member of the Class is not obligated "to make an affirmative showing of marketable title" to prevail against Sunoco, *Quinlan*, 25 F.3d at 940; *accord Base*, 563 P.3d at 954 (advising that "it does not

36

appear that the parties even dispute whether [plaintiffs] have marketable title, as [the defendant] has been making royalty payments to [them]").

In the absence of legitimate questions on marketable title in the first instance, marketable title became an affirmative defense, which Sunoco bore the burden to establish. *See, e.g.*, *Pioneer Centres Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A.*, 858 F.3d 1324, 1335 (10th Cir. 2017); *FTC v. Morton Salt Co.*, 334 U.S. 37, 44–45 (1948) ("[T]he burden of proving justification or exemption under a special exception to the prohibitions of a statute generally rests on one who claims its benefits[.]"). Sunoco pleaded a lack of marketable title as an affirmative defense, and "the burden of proving all affirmative defenses rests on the defendant." *Roberts v. Barreras*, 484 F.3d 1236, 1241 (10th Cir. 2007). Placing the impossible burden on each Class member to determine how Sunoco conducted its internal corporate decision-making on the lack of marketable title would be both unworkable and unreasonable.

Sunoco failed to meet its burden to establish a lack of marketable title. At trial, Sunoco presented Kraettli Epperson "as an expert on marketable title." *Cline II*, 479 F. Supp. 3d at 1163. But Epperson "did not examine any titles" and "could not testify that any of the owners did not have marketable title." *Id.* Beyond this, "Epperson did not conduct a title search on property of any of the 53,000 owners to whom Sunoco made late payments. He offered

37

no opinion on the state of any titles at issue in this case." *Id.* Thus, Sunoco's expert was unable to locate a single instance out of over 1.5 million late payments where legitimate questions on marketable title justified the late proceeds payment to an owner.

Finally, Sunoco argues that affirmative defenses are individualized and defeat class certification. *See* Reply Br. at 19. But affirmative defenses rarely defeat class certification, especially where, as here, they target only the amount of damages owed by a defendant:

> In many circumstances, however, a class that otherwise satisfies predominance can be certified even if affirmative defenses raise individual questions of law or fact. Courts are generally reluctant to deny class action status under Rule 23(b)(3) simply because affirmative defenses may be available against individual members, such that the presence of individual defenses does not by its terms preclude class certification. Courts in most circuits have adopted some version of this approach. This is particularly true given the range of procedural mechanisms available to courts to deal with potentially individualized affirmative defenses.

2 Newberg and Rubenstein on Class Actions § 4:55 (6th ed. 2025) (footnotes and internal quotation marks omitted); *see also Tyson Foods, Inc.*, 577 U.S. at 453–54 (predominance is met "under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members" (quoting 7AA C. Wright, A. Miller, M. Kane & R. Klonoff, Federal Practice & Procedure § 1778 (3d ed. 2005))); *Olean Wholesale Grocery Coop., Inc. v.*

*Bumble Bee Foods LLC*, 31 F.4th 651, 668 (9th Cir. 2022) (same); *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 544 (6th Cir. 2012) (same); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 301 (3d Cir. 2011) (same); *Smilow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003) (same) (collecting cases).

In sum, we reject Sunoco's challenges to predominance under Rule 23(b)(3) and affirm the district court's decision to certify the Class and thereafter to decline to decertify the Class following the successful class action trial.

## 2

We next address Sunoco's argument that the members of the class were not ascertainable. Sunoco says that the Class should not have been certified because all members of the Class were not identified by name. Op. Br. at 35–37.

Rule 23 does not expressly include an ascertainability requirement. But "most circuits have implemented some version of an ascertainability test as an implied prerequisite to class certification." *Freund v. McDonough*, 114 F.4th 1371, 1378 (Fed. Cir. 2024); *see also Sandusky Wellness Ctr., LLC v. Medtox Sci., Inc.*, 821 F.3d 992, 995 (8th Cir. 2016) (same) (collecting cases). At class certification, the movant must provide "a sufficiently definite" class definition, and "[a]ll courts essentially focus on the question

39

of whether the class can be ascertained by objective criteria." 1 Newberg and Rubenstein on Class Actions § 3:3 (6th ed. 2025). "[A]scertainability requires only that the court be able to identify class members at some stage of the proceeding." *Freund*, 114 F.4th at 1378 (internal quotation marks omitted).

In challenging ascertainability, Sunoco argues that we should adopt the minority view that "administrative feasibility" is a required element of the test for ascertainability. In support, Sunoco cites *Adashunas v. Negley*, 626 F.2d 600, 604 (7th Cir. 1980), a Seventh Circuit decision from several decades ago.[15] Reply Br. at 14. Sunoco contends that class certification violates the "administrative feasibility" factor because locating class members will be time-consuming and overly difficult. However, Sunoco cannot defeat class certification either by failing to keep proper records or failing to produce them. *See Cline II*, 479 F. Supp. 3d at 1171 n.21 (declining to "allow Sunoco to hide behind a mess of its own making" by failing to keep proper records).

---

[15] Not only does this 1980 decision precede the amendments to modern Rule 23, but it also advises that a court facing an overbroad class definition should narrow it – not outright deny class certification, and thereby deny relief to the entire class. *See Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672, 678 (7th Cir. 2009) (citing *Adashunas*, 626 F.2d at 603-04).

The record demonstrates that Sunoco failed to gather and produce the owner information it was statutorily required to maintain under the PRSA. And gaps in the records kept and produced by a defendant cannot be used to hinder class certification. *See Kelly v. RealPage Inc.*, 47 F.4th 202, 223 (3d Cir. 2022). It is settled that "where [a defendant's] lack of records makes it more difficult to ascertain members of an otherwise objectively verifiable class, the [individuals] who make up that class should not bear the cost of the [defendant's] faulty record keeping." *Id.* (alterations in original) (quoting *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 470 (3d Cir. 2020));[16] *see also Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 525-26 (6th Cir. 2015) (advising that ascertaining the class members requires only "reasonable accuracy" and that class certification is proper even if that "process may require additional, *even substantial*, review of files") (quoting *Young*, 693 F.3d at 539).

---

[16] These bracketed alterations in *Kelly v. RealPage Inc.* expanded the ruling in *Hargrove v. Sleepy's LLC*, 974 F.3d 467 (3d Cir. 2020), which involved an employer-employee dynamic. In *RealPage*, the Third Circuit stated that it is appropriate to "rel[y] on *Hargrove* outside of the employment context for the proposition that a defendant's faulty recordkeeping will not preclude certification of an otherwise ascertainable class." *Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 462 n.13 (3d Cir. 2024) (citing *Kelly v. RealPage Inc.*, 47 F.4th 202, 223 (3d Cir. 2022)). Thus, these ascertainability rulings apply to all class actions.

Nor can "defendants . . . defeat ascertainability with a strategic decision to house records across multiple sources or databases." *Kelly*, 47 F.4th at 223; *Lewis v. Gov't Emps. Ins. Co.*, 98 F.4th 452, 462 & n.13 (3d Cir. 2024) (explaining that "a straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources") (quoting *Kelly*, 47 F.4th at 224); *see also Kelly*, 47 F.4th at 223 (A "matching of records is precisely the sort of exercise we have found sufficiently administrable to satisfy ascertainability in other cases.").

Likewise, a defendant cannot avoid class certification by objecting "to the number of records that must be individually reviewed," because that "is essentially an objection to the size of the class, which . . . explicitly . . . is not a reason to deny class certification." *Kelly*, 47 F.4th at 224; *see also Young*, 693 F.3d at 539-40 (same and collecting cases). "To hold otherwise would be to categorically preclude class actions where defendants purportedly harmed too many people, which would seriously undermine the purpose of a class action to vindicate meritorious individual claims in an efficient manner." *Id. at 225* (internal quotation marks omitted). Indeed, "[i]t is often the case that class action litigation grows out of systemic failures of administration, policy application, or records management that

42

result in small monetary losses to large numbers of people." *Rikos*, 799 F.3d at 525 (quoting *Young*, 693 F.3d at 540). And, thus, "[t]o allow that same systemic failure to defeat class certification would undermine the very purpose of class action remedies." *Id.* at 525–26 (quoting *Young*, 693 F.3d at 540).

At the same time, our circuit has not yet published a decision on whether ascertainability is a separate class certification factor.[17] It appears that there is now some uncertainty, which has left some district courts in this circuit forced to guess about what ascertainability standard to apply. At least two lower courts in our circuit have predicted that we would adopt

---

[17] We did state in the 1970s that "[i]n class action suits there must be presented some evidence of established, ascertainable numbers constituting the class" to satisfy the numerosity requirement in Rule 23(a)(1). *Rex v. Owens ex rel. State of Okla.*, 585 F.2d 432, 436 (10th Cir. 1978). But we did not expand on what that meant, and in the nearly half century since then, Rule 23 and the corresponding case law on class actions and ascertainability have evolved significantly (along with the ability to gather and analyze records electronically, allowing litigants to ascertain in seconds what might have taken months or years in previous decades).

the Seventh Circuit's test for ascertainability, which is the majority rule among our sister circuits.[18]

We join the majority view by adopting the Seventh Circuit's test for ascertainability of a class action's members. We also reject "administrative feasibility" as an additional *required* factor. *Freund*, 114 F.4th at 1378 (quoting *Hayes v. Wal-Mart Stores, Inc.*, 725 F.3d 349, 356 (3d Cir. 2013)). Instead, we "agree with the majority of circuits that there is no basis for finding a lack of ascertainability because it is difficult to identify the class members." *Id.*; *see also id.* at 1378 n.6 (collecting cases from the Second, Seventh, Eighth, and Ninth Circuits). Rather, as our sister circuits have explained, "administrative feasibility may bear on whether class resolution is superior to individual resolution," but it should not operate as a trump card that outweighs all other factors under Rule 23. *Id.*; *see also Davoll v. Webb*, 194 F.3d 1116, 1146 (10th Cir. 1999) (upholding district court's

---

[18] In two multi-district litigations involving complex class actions in the District of Kansas, both district courts predicted our adoption of the Seventh Circuit's test for ascertainability, "under which the class definition must not be too vague, the class must not be defined by subjective criteria, and the class must not be defined in terms of success on the merits." *In re: Syngenta AG MIR 162 Corn Litig.*, No. 14-MD-2591-JWL, 2016 WL 5371856, at *2 (D. Kan. Sept. 26, 2016); *see also In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, No. 17-MD-2785-DDC-TJJ, 2020 WL 1180550, at *11 (D. Kan. Mar. 10, 2020) (same).

exercise of discretion that determining class membership would be administratively infeasible).

For class members to be ascertainable, the class definition must (1) be defined clearly and cannot be defined too vaguely, and (2) be defined objectively and cannot be based on subjective criteria, such as by a person's state of mind.[19] *Mullins v. Direct Digit., LLC*, 795 F.3d 654, 659–60 (7th Cir. 2015). Again, we "see no reason" to make administrative feasibility a required element of this test, "particularly given the strong criticism it has attracted from other courts." *Rikos*, 799 F.3d at 525; *see also Mullins*, 795 F.3d at 662 (same). In contrast, we require the movant seeking class certification to show that class members can ultimately be identified (i.e., they are ascertain-*able* but not necessarily ascertained at the time of class certification) using "reasonable – but not perfect – accuracy." *Rikos*, 799 F.3d at 526.

The Class satisfied this ascertainability standard. The district court made specific fact-findings that the class was objectively defined with a

---

[19] We again decline to decide whether a "fail-safe" class definition is an independent bar to class certification because this argument was not adequately briefed. *Sherman v. Trinity Teen Solutions, Inc.*, 84 F.4th 1181, 1191 n.6 (10th Cir. 2023). A "fail-safe" class is "one that is defined so that whether a person qualifies as a member depends on whether the person has a valid claim." *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012).

reliable and administratively feasible mechanism for determining class membership. *Cline I*, 333 F.R.D. at 688. Sunoco does not challenge these findings of fact, again failing to point us to an error in the trial proceedings or district court rulings. Having paid every class member principal proceeds and deemed its own records sufficient to satisfy its obligations under the PRSA, Sunoco is not permitted to cast doubt on its own record-keeping to avoid liability. *See Soutter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 197–98 (E.D. Va. 2015) ("In general, courts do not look favorably upon the argument that records a defendant treats as accurate for business purposes are not accurate enough to define a class.").

This is especially true in this case because, as a "first purchaser" of oil, Sunoco is obligated under the PRSA to keep proper records on the payments owed and made to owners. *Cline II*, 479 F. Supp. 3d at 1172. And Sunoco does not contest on appeal the district court's factual findings on ascertainability or its ability to locate members of the Class. The district court found:

> Unsurprisingly, Sunoco conflates doing what is impossible with doing what is hard. No doubt, figuring out what Sunoco owes to interest owners is difficult when it has failed to comply with the PRSA for years. Had Sunoco done its homework in the years before this suit, it would have known how much interest it owes, and could have presented a compilation or summary. *See* Fed. R. Evid. 1006. Sunoco's own evidence shows that it has the ability to determine what Sunoco owes interest owners; it just

46

does not do so until asked. Thus, Sunoco's arguments fall far short.

*Id.* at 1164-65. For all these reasons, we affirm the district court's ruling that the Class satisfied ascertainability.[20]

## B

Sunoco next challenges standing. It contends that a portion of the Class was not identified by name because Sunoco had only the account information, not the names for each "flesh and blood" class member.[21] As a

---

[20] Beyond its challenges to class certification based on predominance and ascertainability, Sunoco also lists several other class action factors, left undeveloped as legal arguments, that we decline to review under "the doctrine of appellate-briefing waiver." *In re Syngenta AG MIR 162 Corn Litig.*, 111 F.4th 1095, 1112 (10th Cir. 2024). The mere "[r]ecitation of a tale of apparent injustice . . . cannot substitute for legal argument." *Id.* (internal quotation marks omitted). Sunoco asserts, for instance, that the district court violated the Rules Enabling Act and that some class members had intra-class conflicts based on indemnity agreements. Sunoco also mentions that determining the date of first-sale as a factual matter defeated the typicality and adequacy requirements under Rule 23(a)(3) and (4). Before the district court, it made a similar argument to challenge predominance. *See* Aplt. App. I at 202. But even if this argument was not waived as under-developed on appeal, the district court's fact-finding, made in reliance upon the Class's expert, was not an abuse of discretion.

[21] Sunoco inserted a "flesh and blood" phrase or argument for the first time in its reply brief, no less than six times. Reply Br. at 6, 7, 12, 16, 22, 23. But it does not adequately explain the meaning of that phrase nor provide a citation for any authority that would give this phrase legal significance to this case.

47

result, Sunoco argues that the entire class action failed for lack of standing. We disagree.

To establish standing, a plaintiff must demonstrate that they (1) "ha[ve] suffered or likely will suffer an injury in fact," (2) "the injury likely was caused or will be caused by the defendant," and (3) "the injury likely would be redressed by the requested judicial relief." *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024). The Class met all three factors. Sunoco underpaid every class member by failing to automatically pay interest (monetary injury), and every time it did so, the cause of this underpayment is directly traceable to (and, thus, directly redressable by the damages paid by) Sunoco.

Sunoco's standing challenge focuses primarily on the Article III standing of the Class members whose damages awards were allocated to unclaimed state property funds. Sunoco argues that class members who have not been located have not been injured, but it fails to offer any legal support addressing its unclaimed property fund argument.

The district court's reasoning on standing is sound. "Each state has created by statute a government agency that collects money held by businesses for people who cannot be found. The agency holds the money on behalf of the true owners." *Cline II*, 479 F. Supp. 3d at 1162. In turn, "[o]nce the state receives the money on behalf of the individual, the owner can claim

the money." *Id.* at 1172 (citing Okla. Stat. Ann. tit. 60, §§ 661, 663–64, 674–75; Tex. Prop. Code Ann. §§ 74.304, 74.501 (state unclaimed property funds for Oklahoma and Texas)). Therefore, "[p]aying the state amounts to paying the owner or an agent or trustee on behalf of the owner. Thus, each class member has suffered an injury because Sunoco has withheld interest it owes to the owner." *Id.*

Sunoco has not presented persuasive arguments to the contrary. Oklahoma has adopted the Uniform Unclaimed Property Act, and "this statutory scheme governs the distribution of unclaimed or abandoned property in Oklahoma." *Unit Petroleum Co. v. Veitch*, 79 F. Supp. 3d 1234, 1241 (N.D. Okla. 2015); *see* Okla. Stat. Ann. tit. 60, § 651–88 (the Uniform Unclaimed Property Act (UUPA)). Sunoco says the district court's award to the unclaimed property funds is an invalid order of "escheat," which "is a procedure with ancient origins whereby a sovereign may acquire title to abandoned property if after a number of years no rightful owner appears." *Dani v. Miller*, 374 P.3d 779, 786 n.4 (Okla. 2016). But Sunoco's effort to defeat standing by its escheat argument is off the mark because the UUPA is "not" an "escheat" statute. *See TXO Prod. Corp. v. Oklahoma Corp. Comm'n*, 829 P.2d 964, 971–72 (Okla. 1992) (explaining that the UUPA is not a true escheat statute but rather a custodial taking law). Oklahoma's unclaimed property fund "protects the owners of unclaimed property by

49

providing an orderly system of recovery for presumably abandoned property[.]" *Dani*, 374 P.3d at 788 (rejecting numerous constitutional challenges to Oklahoma's UUPA statute); *see also Croslin v. Enerlex, Inc.*, 308 P.3d 1041, 1049 (Okla. 2013) (advising that the UUPA properly ensures "mineral proceeds of unknown and unlocated property owners will be safeguarded[.]"). Which is to say, the payments to the unclaimed property fund do not defeat the injury in fact requirement of standing.

Both Oklahoma, where the oil wells at issue in this case are located, and Texas, where Sunoco is headquartered and sends unclaimed funds for which it has no owner information, *Cline II*, 479 F. Supp. 3d at 1160, have adopted the UUPA. *Dani*, 374 P.3d at 786; *Clark v. Strayhorn*, 184 S.W.3d 906, 910 (Tex. App. 2006). In contrast, Sunoco's novel view on standing would motivate oil and gas companies to make every effort to *avoid* locating owners entitled to proceeds and interest under the PRSA. That would undermine the statutory purpose of both the PRSA and the UUPA, which is "designed so that unclaimed property is held by and for the benefit of the state until the rightful owner can be found, and . . . is intended to prevent a windfall to a private holder seeking to claim property for [itself]." *Unit Petroleum*, 79 F. Supp. 3d at 1241 (citing *Combs v. B.A.R.D. Indus. Inc.*, 299 S.W.3d 463, 471–72 (Tex. App. 2009)).

In addition, Sunoco's standing argument fails because it admits, as it must, that it owes a statutory duty to keep adequate records regarding its royalty payments. *See* Okla. Stat. Ann. tit. 52, § 570.12(A). And Sunoco's deficient recordkeeping is the reason these royalty owners are not identified by name. In this case, "Cline offered evidence" showing that "Sunoco did not make a bona fide effort to find people before sending their proceeds to unclaimed property funds" and even "threatened to send one of Cline's interest checks to unclaimed property, even though it was in litigation with Cline, knew his address, and had frequent contact with his lawyers[.]" *Cline II*, 479 F. Supp. 3d at 1162 n.15.

Thus, although "Sunoco has vigorously argued that its own records are too unreliable to explain why it made a late payment," we agree that "interpret[ing] the PRSA to impose on the owners the burden to prove why Sunoco withheld payment" in turn "would effectively allow Sunoco to hide behind a mess of its own making, claiming innocence." *Id*. at 1171 n.21; *see also Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 607 (D. Kan. 2014) (pointing out in a consumer class action the danger that a defendant "could immunize itself from class certification by merely choosing not to keep records[.]").

Simply put, every class member was underpaid by Sunoco and therefore has standing based on a monetary injury that is traceable and

51

redressable by Sunoco. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("If a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."). For all these reasons, we reject Sunoco's standing argument.[22]

## C

We next turn to the outcome of the bench trial – damages. This case proceeded as a class action to trial, and then to post-trial proceedings to allocate the damages to the Class. The district court issued its trial opinion with its findings of fact and conclusions of law, as Federal Rule of Civil Procedure 52(a) requires.

On appeal, we review the district court's legal rulings de novo and the district court's findings of fact "must not be set aside unless clearly erroneous." Fed. R. Civ. P. 52(a)(6). Thus, "deference to the trier of fact" is "the rule, not the exception." *Anderson v. City of Bessemer City*, 470 U.S. 564, 575 (1985). Our role is limited "[i]n reviewing the district court's findings after a bench trial for clear error," and "we do not retry the facts."

---

[22] In a footnote to its opening brief, Sunoco also argues that "any claim to interest on proceeds sitting in unclaimed-property funds is not prudentially ripe." Because this argument is underdeveloped and inadequately briefed, we deem it to be waived. *Valdez v. Macdonald*, 66 F.4th 796, 834 (10th Cir. 2023).

*MVT Servs., LLC v. Great W. Cas. Co.*, 118 F.4th 1274, 1281 (10th Cir. 2024).

Sunoco challenges the award of prejudgment interest owed at a 12 percent rate, compounded annually, until the date the trial order was published.[23] "When royalty proceeds are not paid within the time constraints outlined in the [PRSA], interest begins to accrue and is compounded annually." *Krug*, 362 P.3d at 212. Sunoco primarily argues that a significant amount of interest was added after the date of trial, which is unfair and unlawful.

Both parties frame this issue on appeal as a question of prejudgment interest. This circuit has also described the damages owed for unpaid PRSA statutory interest as "prejudgment interest," *Okland Oil Co. v. Conoco Inc.*, 144 F.3d 1308, 1320 (10th Cir. 1998). Prejudgment interest in a diversity action is "a substantive matter governed by state law." *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1134 (10th Cir. 2002).

To the district court, Sunoco argued that "once it makes the late payment to the interest owner, statutory interest stops accruing." *Cline II*,

---

[23] As a cutoff date for when prejudgment interest stopped accruing, the district court stated that it used the date that it issued its trial decision, which was published on August 17, 2020. *See Cline II*, 479 F. Supp. at 1161 n.13 (explaining that "the interest owed in this case is $74,763,113.00 plus any additional interest due from December 17, 2019, to the date of this Opinion.").

479 F. Supp. 3d at 1175. In response, the Class argued that "Sunoco owes compound interest until Sunoco pays the statutory interest." *Id.* At trial and on appeal, "Sunoco interprets 'until the day paid' to mean 'until the day Sunoco paid the proceeds.' Thus, Sunoco argues that it does not owe compound interest." *Id.*; *see* Op. Br. at 51–52.

The district court sided with the Class, determining that "compound interest is a common feature in investments and means simply that interest becomes part of the principal and therefore earns interest." *Cline II*, 479 F. Supp. 3d at 1175. It further cited and adopted the reasoning of *Cockerell Oil Props., Ltd v. Unit Petroleum Co.*, No. CIV-16-135-KEW, 2020 WL 2110904, at *2 (E.D. Okla. May 4, 2020), which held that compound interest, as used in the PRSA, is "unambiguous" and "provid[es] for the annual accrual of interest on the accumulated interest on any unpaid proceeds not paid timely under the provisions of that statute."

We start with the PRSA's plain language. *See Am. Airlines, Inc. v. State, ex rel. Oklahoma Tax Comm'n*, 341 P.3d 56, 64 (Okla. 2014) ("The cardinal rule of statutory construction is to ascertain and give effect to the legislative intent and purpose as expressed by the statutory language."). The PRSA states, in relevant part:

> [T]hat portion [of the proceeds] not timely paid shall earn interest at the rate of twelve percent (12%) per annum to be

54

> compounded annually, calculated from the end of the month in which such production is sold until the day paid.

Okla. Stat. Ann. tit. 52, § 570.10(D)(1).

As the Class argues, under Oklahoma law and universally across jurisdictions, "amounts of unpaid interest become part of the principal; that is the technical definition of 'compound interest.'" Resp. Br. at 55. Oklahoma's statute defining compound interest says this expressly. *See* Okla. Stat. Ann. tit. 25, § 27 ("The words 'compound interest' mean interest *added to the principal* as the former becomes due, and *thereafter made to bear interest.*" (emphasis added)).

As unpaid compound interest accrues, it is *added* to the principal, effectively converting it from unpaid interest to become a portion of the underlying unpaid principal proceeds that are owed to the plaintiff. *See id.*; *see also* 47 C.J.S. Interest & Usury § 2 ("Compound interest is interest on interest. It is paid both on the principal and the previously accumulated interest. Accrued interest is added periodically to the principal, and interest is computed upon the new principal thus formed. (footnotes omitted)"); 44B Am. Jur. 2d Interest and Usury § 41 (same). Nor does Sunoco refute that, generally, debt payments are applied to any unpaid interest before they ever are applied to reduce the unpaid principal. *See* Resp. Br. at 56 (citing *Landess v. State ex rel. Comm'rs of Land Off.*, 335 P.2d 1077, 1079 (Okla.

55

1958) ("[T]he rule is to apply the payments in the first place to the discharge of the interest then due and the remainder on the principal.") (internal quotation marks omitted)).

We agree with the dissent that the accrual date for payment stops the day *something* is paid. Dissent at 3 (emphasis in original). However, the dissent concludes the "something" is "that portion [of proceeds] not timely paid." *Id.* But this reading of the PRSA does not give adequate weight to the language that commands those unpaid proceeds "shall earn interest . . . to be compounded annually." § 570.10(D)(1). Thus, under Oklahoma law, the better reading of the PRSA is "take all of its provisions and read them as a whole so that each provision will be in harmony with every other, . . . ." *Melton v. Quality Homes, Inc.*, 312 P.2d 476, 479 (Okla. 1957). The PRSA mandates the payment of unpaid proceeds and compounded interest, so we agree with the district court that the accrual date stops when "that portion [of proceeds and compounded interest are] paid." § 570.10(D)(1) (citation modified).

Even if the PRSA's language on compound interest were ambiguous (which it is not), we would affirm and reach the same result by applying Oklahoma's rules of statutory construction. *See Am. Airlines*, 341 P.3d at 64 ("If the legislative intent cannot be ascertained from the language of a statute, as in the cases of ambiguity, we must apply rules of statutory

56

construction."). In interpreting the PRSA specifically, the Oklahoma Supreme Court has directed that "[l]egislative intent controls statutory interpretation." *Krug*, 362 P.3d at 210. So we must "give effect to the legislative intent and the public policy underlying the intent." *Am. Airlines*, 341 P.3d at 65.

Furthermore, the Oklahoma "Legislature has expressed its intent that it shall be the public policy in Oklahoma for royalty owners to receive prompt payment from the sale of oil and gas products." *Hull*, 789 P.2d at 1279; *see also In re Tulsa Energy, Inc.*, 111 F.3d 88, 90 (10th Cir. 1997) (same). To this end, "[f]rom 1980 to 1989," the PRSA "provided for interest of twelve percent per annum, without compounding." *Hebble v. Shell W. E & P, Inc.*, 238 P.3d 939, 945 (Okla. Civ. App. 2009).[24] Not only does the statute now mandate that unpaid proceeds "shall earn interest at the rate of twelve percent (12%) per annum to be compounded annually . . . until the day paid," but "[t]he prejudgment interest authorized by § 570.10 constitutes a part of the judgment and is considered a part of the total liability recovered." *Id.* (quoting § 570.10); *see also id.* at 946 (advising that "prejudgment interest under the PRSA is part of [the] compensatory

---

[24] *Hebble* involved a challenge to the trial court's instruction to the jury about the awarding of prejudgment interest under the PRSA. 238 P.3d at 946. It did not interpret the PRSA's "until the day paid" language that is at issue here.

damages" to be awarded). We decline to reach a conclusion that "conflicts with the spirit and letter of [the PRSA] and [violates] the public policy intended to be promoted through its enactment – prompt payment to royalty owners of proceeds from the sale of oil or gas." *Hull*, 789 P.2d at 1280.

Under Oklahoma law, and the law of most states generally,[25] "[p]rejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achieving full compensation for the injury those damages are intended to redress." *Krug*, 362 P.3d at 214. Indeed, "[i]t is an element of the total liability adjudicated." *Id.*

On top of this, we are bound to recognize that the Oklahoma "Legislature has followed a path of strengthening mineral owners['] rights since the [PRSA's] inception." *Id.*; *see also Hull*, 789 P.2d at 1279 (same). The Oklahoma legislature "removed" language in the PRSA that led courts

---

[25] "Prejudgment interest . . . is part of the actual damages sought to be recovered." *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1134 (10th Cir. 2002) (quoting *Johnson v. Continental Airlines Corp.,* 964 F.2d 1059, 1062–63 (10th Cir. 1992)). Thus, "[p]rejudgment interest is an element of complete compensation," and without awarding prejudgment interest, a plaintiff is not made whole because it loses out on the time value of money. *Morrison Knudsen Corp. v. Ground Improvement Techs., Inc.*, 532 F.3d 1063, 1073 (10th Cir. 2008) (quoting *West Virginia v. United States*, 479 U.S. 305, 310 (1987)).

to interpret the statute as punitive. *Krug*, 362 P.3d at 213 n.24. When a legislature amends a statute, we presume that "it intends its amendment to have real and substantial effect." *Bufkin v. Collins*, 145 S. Ct. 728, 741 (2025) (quoting *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258–59 (2004)); *see also Estrada v. Smart*, 107 F.4th 1254, 1268 (10th Cir. 2024) (same). Taken together, we discern from the statutory text and a clear legislative intent to make royalty owners whole by compensating them for the lost time value of their money.

Sunoco claims it is unfair to compound the prejudgment interest owed because the delays caused by the district court's initial order allocating damages – which we reversed – caused an increase in the amount of prejudgment interest. But "courts should not read into a statute exceptions not made by the Legislature." *Antini v. Antini*, 440 P.3d 57, 60 (Okla. 2019) (quoting *Seventeen Hundred Peoria, Inc. v. City of Tulsa*, 422 P.2d 840, 843 (Okla. 1966)). Similarly, the PRSA states that prejudgment interest "shall" accrue at 12 percent, and "the word 'shall' is a mandatory command" we are obligated to follow. *State ex rel. W. State Hosp. v. Stoner*, 614 P.2d 59, 63 (Okla. 1980); *see also Smith v. Spizzirri*, 601 U.S. 472, 476 (2024) (same). As a federal court sitting in diversity jurisdiction, we are "not free to engraft" any "exceptions or modifications" to Oklahoma law. *Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4 (1975). Our "proper function"

59

in a diversity case "is to ascertain what the state law is, not what it ought to be." *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941).

Moreover, we have also already considered and rejected the notion of an equitable exception argument to prejudgment interest. Applying Colorado law, which is substantially similar to Oklahoma law on prejudgment interest, we held that it was reversible error to insert an equitable exception into a state statute awarding prejudgment interest. *See Echo Acceptance Corp. v. Household Retail Servs., Inc.*, 267 F.3d 1068, 1092 (10th Cir. 2001) ("Regardless of the factors that contributed to the length of time during which prejudgment interest was accruing[,]" there is "no discretion" to add an equitable exception.). A state prejudgment interest statute – whether Colorado's or Oklahoma's – "merely recognizes the time value of money" and restores the plaintiff to the position the plaintiff would have been in but for the defendant's harm. *Id.* (internal quotation marks omitted).

Finally, Sunoco argues that the Energy Litigation Reform Act (ELRA), Okla. Stat. Ann. tit. 52, §§ 901-03, expressly limits the scope of damages and "confirms that extra-statutory prejudgment interest is off the table." Op. Br. at 54. Sunoco contends the ELRA, which was enacted in 2012, requires that "no interest beyond what the PRSA awards as damages—which stops accruing once proceeds are paid—may be awarded."

*Id.* It is questionable whether this ELRA argument was properly raised before the district court to not be forfeited on appeal, *Richison v. Ernest Group, Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011), however, the Class does not raise forfeiture in its Response Brief because it does not mention Sunoco's ELRA argument regarding prejudgment interest at all. Nevertheless, Sunoco cites no authority to support its reading that the ELRA mandates that interest stops accruing once proceeds are paid, and we are aware of none. Based upon the thin argument presented and the depth of authority that supports our holding, we are not persuaded that Sunoco's ELRA argument alters our reading of the PRSA's compound interest or merits Sunoco any relief.

We affirm the district court's final actual damages award, which included the additional prejudgment interest added until the entry of the district court's trial opinion.

**D**

The last argument we reach is Sunoco's challenge to the punitive damages award. The district court awarded $75 million in punitive damages, ruling that Sunoco willfully violated the PRSA by failing to pay interest that it knew was owed to every class member without receiving an

individual demand from each royalty owner. *Cline II*, 479 F. Supp. 3d at 1178–81.

On appeal, Sunoco argues that punitive damages are available only for tort claims, not claims for breach of contract, and the PRSA claim must be interpreted as a breach of contract claim under Oklahoma law. In response, the Class argues that the PRSA creates a statutory tort, and that the ELRA expressly allows punitive damages in a case also involving a claim and liability under the PRSA. *See* Okla. Stat. Ann. tit. 52, § 903 (allowing punitive damages under the ELRA if a factfinder determines "upon clear and convincing evidence" that the defendant failed to pay required proceeds "with the actual, knowing and willful intent: (a) to deceive the person to whom the proceeds were due, or (b) to deprive proceeds from the person the holder knows, or is aware, is legally entitled thereto"). We agree with Sunoco and vacate the punitive damages award.

The district court found that the Class had to clear two hurdles to be awarded punitive damages, the ELRA and the Oklahoma punitive damages statute, Okla. Stat. Ann. tit. 23, § 9.1. By awarding punitive damages, the district court found that the Class was successful in its clearance of both. However, the punitive damages award runs afoul of Oklahoma law, which precludes punitive damages for a breach of contract claim. *See* Okla. Stat. Ann. tit. 23, § 9.1(A) ("In an action for the breach of an obligation *not arising*

*from contract*, the jury, in addition to actual damages, may, . . . award punitive damages . . .) (emphasis added).

Taking a step back, we acknowledge again that the only claim before us on appeal is the PRSA claim because the Class did not prevail on the fraud claim at trial. Under Oklahoma law, a claim under the PRSA is construed as a claim for breach of contract. *Purcell*, 961 P.2d at 193; *see also Krug*, 362 P.3d at 213 (explaining that the 12 percent interest owed under the PRSA "should not be characterized as a penalty but, rather, an integral part of a contractual claim"). Which is to also say, under Oklahoma law, a party cannot recover punitive damages unless it also prevails on an *independent* tort claim for fraud, deceit by nondisclosure, or a similar tort claim that permits punitive damages. We made this point in our decision in *Zenith Drilling Corp. v. Internorth, Inc.*, 869 F.2d 560 (10th Cir. 1989), where we explained that punitive damages are available under Oklahoma law in a case involving a breach of contract only when a plaintiff prevails on an "independent, willful tort[.]" *Id.* at 565 (quoting *Z.D. Howard Co. v. Cartwright*, 537 P.2d 345, 347 (Okla. 1975)).

To sidestep the general rule that a party cannot receive punitive damages based on a breach of contract claim, the Class argues that the PRSA created a statutory tort. This argument has been rejected by Oklahoma courts. *See, e.g.*, *Purcell*, 961 P.2d at 191–94 (rejecting the

63

argument that the PRSA creates "statutory liability" that arises "separately" and instead stating that the "12 [percent] interest" awarded as PRSA damages is "part of the contractual claim"); *Krug*, 362 P.3d at 213 (explaining that the 12 percent interest owed under the PRSA "should not be characterized as a penalty but, rather, an integral part of a contractual claim"); *Hebble*, 238 P.3d at 945 ("[t]he PRSA does not create a statutory claim.").

In *Purcell*, the Oklahoma Supreme Court held that a PRSA violation "is based upon a breach of the obligation to pay the royalty arising *ex contractu* in the manner prescribed by [the PRSA]." 961 P.2d at 193 (citation omitted); *see also Ex Contractu*, Black's Law Dictionary (12th ed. 2024) (defining "*ex contractu*" as "[a]rising from a contract"); *see also Uptegraft v. Home Ins. Co.*, 662 P.2d 681, 684–85 (Okla. 1983) (holding that a claim for relief that is *ex contractu* "is clearly a contract action"). Just last year, the Oklahoma Supreme Court reaffirmed this language from *Purcell*, holding that "claims under the PRSA are really an action *ex contractu*—i.e., they arise out of *a* contract[.]" *Base*, 563 P.3d at 953 (emphases in original). The continued expression of this legal principle by Oklahoma courts leaves no reason for us to doubt that a PRSA claim is a breach of contract and thus excluded from potential punitive damages awards by statute.

The Class also argues that the ELRA is another route to the punitive damages award. The district court assumed the ELRA was applicable and focused on whether "Sunoco's conduct overcomes the ELRA's bar to punitive damages." *Cline II*, 479 F. Supp. 3d at 1178.

As the Class did here, a plaintiff can pursue a PRSA breach of contract claim for underpayment of royalties alongside a claim for common law fraud or deceit in the same case. *See Okland Oil Co.*, 144 F.3d at 1314. The Oklahoma Supreme Court has also held that "the claims of fraud, deceit, constructive fraud, and punitive damages are appropriate for class certification." *Weber v. Mobil Oil Corp.*, 243 P.3d 1, 7 (Okla. 2010). As a result, there is no barrier to a single plaintiff or a class pursuing and recovering damages for both a PRSA breach of contract and a fraud claim in the same case.

Oklahoma law, however, draws a distinction between the claims for breach of contract and fraud. *See Finnell v. Seismic*, 67 P.3d 339, 345 (Okla. 2003) (explaining that the "words negligent and willful are legal terms of art that refer to tortious conduct" rather than a "breach of contract"). A PRSA claim, which is construed as a breach of contract, does not require any showing of "actual, knowing and willful intent" to deceive or deprive

65

the victim of proceeds, which is required to obtain punitive damages under the ELRA. Okla. Stat. Ann. tit. 52, § 903.

In this context, owners suing for an intentional tort like fraud or deceit are alleging fraud in the *performance* of existing contracts (or leases), not that they detrimentally relied on the promises of the defendant to enter a contract or a lease in the first place (i.e., fraudulent inducement). The owners "already ha[ve] a protectable interest" to be paid royalties (and interest for late payments under the PRSA) based on their existing "contracts" or leases. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 (2d Cir. 2013).[26]

The dissent voices strong opposition to this reasoning and concludes that our reading of "§ 9.1, a general statute governing punitive damages in breach-of-contract cases, as somehow overriding § 903's exclusive remedy." Dissent at 7. We agree with the dissent that, under Oklahoma law, "when there is a conflict between two statutes, one specific . . . and one general, the statute enacted for the purpose of dealing with the subject matter

---

[26] Both fraudulent inducement and fraud in the performance of an existing contract are cognizable forms of fraud. *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 123 (2d Cir. 2013). This court approvingly discussed the Second Circuit's decision in *In re U.S. Foodservice* and other similar cases (including state common law fraud decisions) in *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1089–91 (10th Cir. 2014), explaining that class certification of a fraud claim can be based on "circumstantial proof of classwide reliance."

controls over the general statute." *Stitt v. Treat*, 546 P.3d 882, 893 (Okla. 2024). But we discern no conflict in the statutes here and instead determine that Oklahoma's punitive damages statute § 9.1 "must be read harmoniously" with the ELRA § 903. *Id.* at 892. Which is to say, we agree the ELRA allows for punitive damages to be awarded in a PRSA case so long as the plaintiff alleges and proves an independent, intentional tort to the statutory standard set out in the ELRA § 903.

The trial found that Sunoco's liability arose from a PRSA violation (breach of contract), not an intentional tort (fraud). Because the Class did not prevail on its independent, intentional tort claim, the ELRA does not provide a backdoor to an award of punitive damages in this case. As a result, with only a PRSA claim proved at trial, which we must interpret as a breach of contract under Oklahoma law, the punitive damages award cannot stand. For these reasons, we vacate the punitive damages award.

## III

We **AFFIRM** the district court's orders granting class certification and denying post-trial class decertification, along with the orders determining the actual damages awarded to the Class, including prejudgment interest. We **VACATE** the punitive damages award and **REMAND** for the district court to amend the judgment consistent with this opinion.

67

23-7090, *Cline v. Sunoco*

**MORITZ**, Circuit Judge, concurring in part, dissenting in part.

I join sections II.A and II.B of the majority opinion analyzing class certification and standing. I write separately to address the interest and punitive damages Cline can recover under Oklahoma law.

As I see it, Oklahoma's Production Revenue Standards Act (PRSA), Okla. Stat. tit. 52, §§ 570.1–570.15, dictates that interest on unpaid oil proceeds stops accruing once the proceeds are paid, even if some amount of statutory interest remains outstanding. So unlike the majority, I would vacate the district court's nearly $104 million interest award (which reflects accrual through the date of judgment) and remand for recalculation.

As for punitive damages, I would give effect to the Energy Litigation Reform Act (ELRA), Okla. Stat. tit. 52, §§ 901–903, which specifically authorizes punitive awards against defendants that willfully withhold proceeds. Because the ELRA and PRSA provide the exclusive remedies for these oil and gas claims, Oklahoma's general prohibition on punitive damages in contract cases—which the majority sees as a barrier to Cline's recovery—simply does not apply here. Punitive damages would thus be available if the district court made an appropriate finding. But the district court found that Sunoco intended to withhold the *interest*, not the *proceeds*. So I join the majority in vacating the $75 million punitive award but would remand for the district court to reconsider punitive damages under the correct ELRA standard.

Fundamentally, both issues turn on the special statutes applicable to the oil and gas industry. I start by explaining the relevant statutes and then discuss their application to the interest and punitive-damages questions raised here.

Oklahoma has carved out a distinct set of rules for oil and gas disputes, of which the PRSA and the ELRA are part. *See generally* Okla. Stat. tit. 52 ("Oil and Gas"). Per the ELRA, the PRSA provides the "exclusive remedy" for late payment of oil and gas proceeds (subject to certain listed exceptions not relevant here). Okla. Stat. tit. 52, § 903. When a company like Sunoco fails to pay well owners on time, well owners can recoup "actual damages," which are "limited to the proceeds due and the interest as provided in [the PRSA]." *Id.* Actual damages "are deemed to be adequate remedies for failure to pay proceeds," unless a court finds that the defendant withheld proceeds with the requisite intent, in which case punitive damages are available, too. *Id.*

Because Oklahoma has specifically enumerated the sole remedies for late payment of proceeds—and clarified that such remedies fully compensate plaintiffs— we don't need to look to the state's general remedies statutes to determine what remedies are available here. *See* Okla. Stat. tit. 23, §§ 6, 9.1 (part of Chapter 1, "Damages in General," of Title 23, "Damages"). Instead, we go straight to the oil and gas statutes, which answer both damages questions on appeal.

Let's begin with the PRSA's statutory interest provision. It says:

> [W]here proceeds from the sale of oil or gas production or some portion of such proceeds are not paid prior to the end of the applicable time periods provided in this section, that portion not timely paid shall earn interest at

2

> the rate of . . . 12%[] per annum to be compounded annually, calculated from the end of the month in which such production is sold until the day paid.

Okla. Stat. tit. 52, § 570.10(D)(1). Like most statutes, it isn't the easiest thing to read. But it is clear about *how long* interest accrues: "until the day paid." *Id.*

Right off the bat, this means the district court erred in awarding interest up to the date it entered judgment, and the majority errs in affirming this faulty analysis. The district court's award might have been appropriate if Oklahoma's statute assessed interest until "the date of payment or . . . the date judgment is entered, whichever first occurs," like a Colorado statute governing prejudgment interest in contract suits. *Echo Acceptance Corp. v. Household Retail Srvs., Inc.*, 267 F.3d 1068, 1092 (10th Cir. 2001) (quoting Colo. Rev. Stat. § 5-12-102(1)(b)). But the PRSA doesn't say that, so the date of judgment can't be the correct stop date.

What is the correct accrual stop date? Well, "the day [something is] paid." § 570.10(D)(1). And that *something*, if one looks back at the statute, is "that portion [of proceeds] not timely paid."[1] *Id.* Putting this all together, PRSA interest accrues "from the end of the month in which [the oil] is sold until the day [the proceeds from the sale are belatedly] paid." *Id.* This makes intuitive as well as textual sense: once late proceeds are paid, interest stops accruing.

---

[1] The relevant clause reads, "where *proceeds* from the sale of oil or gas production . . . are not paid prior to the end of the applicable time periods provided in this section, that portion not timely paid shall earn interest . . . , calculated from the end of the month in which such production is sold until the day paid." § 570.10(D)(1) (emphasis added).

3

Yes, this means PRSA statutory interest functions differently than typical prejudgment interest. But that's the point of creating special rules, as Oklahoma's done for oil and gas disputes. Indeed, the state's choice to jettison traditional prejudgment-interest rules in favor of distinct rules designed for oil and gas royalties is also apparent in the accrual start dates. Generally, Oklahoma law provides that prejudgment interest begins accruing from a payment's due date. *See* Okla. Stat. tit. 23, § 6 (providing for interest from the day on which "the right to recover [a debt] is vested in . . . the creditor"). And under the PRSA, proceeds are due "not later than the last day of the second succeeding month after the end of the month within which such production is sold"—in other words, roughly two months after the oil sells. § 570.10(B)(1)(b). But PRSA statutory interest starts accruing *before that*, at "the end of the month in which such production is sold." § 570.10(D)(1). This gives well owners two more months of interest than they would receive under traditional prejudgment-interest principles, thereby increasing the penalty for payments that are even slightly late. I see this as further proof that Oklahoma intended to displace traditional prejudgment interest in favor of a distinct statutory remedy for late payment of oil and gas proceeds.

Yet the majority avoids this straightforward understanding by way of the PRSA's requirement that interest "be compounded annually." *Id.* "'[C]ompound interest' mean[s] interest added to the principal . . . and thereafter made to bear interest." Okla. Stat. tit. 25, § 27. From that uncontroversial premise, the majority leaps to the conclusion that adding interest to the principal when calculating interest

4

on proceeds "effectively convert[s] . . . unpaid interest to . . . unpaid . . . proceeds." Maj. Op. 55.

But nowhere does Oklahoma law say that the process of compounding—a simple mathematical step—somehow changes what the law considers "[p]roceeds from the sale of oil or gas production from an oil or gas well." § 570.10(B)(1). And reading all the PRSA's provisions "in harmony," as the majority urges, doesn't change my assessment. Maj. Op. 57 (quoting *Metlon v. Quality Homes, Inc.*, 312 P.2d 476, 479 (Okla. 1957)). To the contrary, the statute's use of "proceeds" and "accrued interest" confirms that the two are separate. § 570.10(D)(2)(b). Addressing the treatment of "proceeds which have not been paid because of unmarketable title," the PRSA provides for interest to be "compounded annually" and authorizes parties "to interplead the proceeds *and* all accrued [compound] interest into court." § 570.10(D)(2)(a), (b) (emphasis added). If proceeds and accrued compound interest were one and the same, as the majority asserts, the statute wouldn't need to reference both.

Perhaps anticipating these textual weaknesses, the majority suggests that Oklahoma legislative intent favors its interpretation. Yet the legislative goal it cites— that "royalty owners . . . receive prompt payment from the sale of oil and gas products"—is equally served by awarding interest until proceeds are paid. Maj. Op. 57 (quoting *Hull v. Sun Refin. & Mktg. Co.*, 789 P.2d 1272, 1279 (Okla. 1989)). If interest accrues until *proceeds* are paid, as it does under these unique statutes, companies like Sunoco have an incentive to pay well owners on time. Awarding

5

additional interest after that just incentivizes companies to pay the interest, not to pay on time in the first place. So in my book, the legislative intent doesn't tip the scales.

Accordingly, I would hold that Oklahoma law does not authorize statutory interest to accrue after late proceeds are paid, even if interest is outstanding. The district court awarded Cline interest through entry of judgment, long after Sunoco paid the overdue proceeds. The interest award has since ballooned to nearly $104 million, over twice the roughly $49 million Sunoco concedes it could be liable for. In upholding that award, the majority significantly misinterprets Oklahoma's statutory scheme and turns legislative intent on its head. I would thus vacate and remand for the district court to recalculate interest through the date of payment, consistent with § 570.10(D)(1).

Now to punitive damages. As with the interest issue, I confine my analysis to the relevant oil and gas statute, § 903. That provision generally forecloses punitive damages for late payment of proceeds, except if:

> there [is] a determination by the finder of fact upon clear and convincing evidence that the holder who failed to pay such proceeds did so with the actual, knowing[,] and willful intent: (a) to deceive the person to whom the proceeds were due, or (b) to deprive proceeds from the person the holder knows, or is aware, is legally entitled thereto.

§ 903. The clear aim of the statute is to permit punitive damages in late-payment actions if the district court makes a sufficient intent finding.

Nevertheless, the majority concludes that the punitive damage award must be vacated not because the district court's findings were insufficient, but because the award doesn't pass muster under Okla. Stat. tit. 23, § 9.1. That provision, entitled

6

"[p]unitive damages awards by jury," sets out criteria for awarding punitive damages in "action[s] for the breach of . . . obligation[s] not arising from contract." § 9.1. Because late-payment claims are based on an underlying contract, the majority reasons that punitive damages are unavailable for such claims.

Once again, the majority's holding is seriously flawed in that it directly contravenes the Oklahoma legislature's express directive in the ELRA that the PRSA provides the "*exclusive remedy*" for late payment of oil and gas proceeds. § 903 (emphasis added). In fact, it's hard to imagine a more blatant deviation from this directive than the path taken by the majority here. Instead of adhering to the "exclusive remedy" for late payment of oil and gas proceeds, *id.*, the majority elects to interpret § 9.1, a general statute governing punitive damages in breach-of-contract cases, as somehow overriding § 903's exclusive remedy.

Even more perplexingly, the majority does so based on language from *Purcell v. Santa Fe Minerals, Inc.*, 961 P.2d 188 (Okla. 1998)—a case that *preceded* the enactment of the ELRA and its exclusive remedy provision. There, the Oklahoma Supreme Court unsurprisingly observed that PRSA interest is "part of [a] contractual claim." *Id.* at 193. Extrapolating from this observation, the majority concludes that plaintiffs can never recover punitive damages on PRSA statutory claims, like Cline's, because those claims are based on royalty agreements—that is, underlying contracts—and § 9.1 prohibits such damages.

In addition to ignoring that the general punitive-damages statute, § 9.1, is irrelevant here, the majority ignores that *Purcell* didn't consider whether a general

7

statute governing punitive damages can somehow negate the ELRA's exclusive-remedy provision governing late-payment remedies, including punitive damages. *See Guidry v. Sheet Metal Workers Nat'l Pension Fund*, 493 U.S. 365, 375 (1990) ("It is an elementary tenet of statutory construction that 'where there is no clear intention otherwise, a specific statute will not be controlled or nullified by a general one.'" (cleaned up) (quoting *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974)). Nor could it have, because Oklahoma didn't enact the ELRA—the statute clarifying that the PRSA and the ELRA's punitive-damages provision provide the exclusive remedy for withheld proceeds—until 2012, well after the Oklahoma Supreme Court decided *Purcell*. Rather, *Purcell* addressed the applicable statute of limitations for a claim to statutory damages under the PRSA. *See* 961 P.2d at 194. And although the Oklahoma Supreme Court later relied on *Purcell*'s characterization of late-payment claims in *Base v. Devon Energy Production Co.*, it again said nothing about the available damages. 563 P.3d 934, 953–54 (Okla. 2024).

The majority's underlying premise seems to be that we can't give effect to an Oklahoma statute expressly permitting punitive damages in one setting if a preexisting statute more generally prohibits punitive damages. Of course, that is not the case. *See BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 614 (1996) (Ginsburg, J., dissenting) ("At least one state legislature has prohibited punitive damages altogether, unless explicitly provided by statute."). "A fundamental premise of statutory construction is that a specific statute dealing with a subject controls over the general statute on the subject, unless it appears the legislature intended the general

8

act to control." *Wetherill v. Bank IV Kan., N.A.*, 145 F.3d 1187, 1193 (10th Cir. 1998). The majority suggests we needn't apply this principal because it "discern[s] no conflict in the statutes here." Maj. Op. 67. But under "a common-sense reading of the various provisions," the typical PRSA action would, in the majority's view, fail § 9.1 even if it satisfied § 903. *Cherokee Nation v. U.S. Dep't of Interior*, 564 P.3d 58, 70 (Okla. 2025) (analyzing potential conflict). That's an effective conflict warranting application of § 903, "[a] statute . . . enacted for the primary purpose of dealing with a particular subject, and which prescribes the terms and conditions of that particular subject matter," over § 9.1, "a general statute which does not refer to the particular subject matter, but does contain language which might be broad enough to cover the subject matter if the special statute was not in existence." *Multiple Inj. Tr. Fund v. Coburn*, 386 P.3d 628, 635–36 (Okla. 2016).

All this to say, I depart from the majority and read Oklahoma's dedicated punitive-damages statute regarding late payment of oil and gas proceeds exactly as the Oklahoma legislature intended it to be read. That is, § 903 authorizes punitive damages if the district court finds that the defendant intended to deceive or deprive the well owner of the withheld proceeds. Full stop.

Nevertheless, I agree with the majority that the district court's punitive damages award cannot survive in its current state. To justify punitive damages, the defendant must have "inten[ded] . . . to deceive . . . or . . . deprive [the well owner of] *proceeds*"—not interest. § 903 (emphasis added). But the district court focused its punitive-damages analysis on interest. It concluded that "Sunoco knew that it owed

9

interest on late payments, but it made no effort to identify those payments to determine the interest it owed—much less pay that interest." App. vol. 2, 451. But that rationale cannot sustain a punitive-damages award under § 903 because Sunoco's intent in withholding proceeds may have differed from its intent in withholding interest. As such, I would vacate and remand the punitive damages award against Sunoco so the district court could analyze the evidence of intent under this standard.

Accordingly, I join the majority opinion except as to its discussions of interest and punitive damages. Hewing closely to the text of Oklahoma's oil and gas statutes, I respectfully dissent from the majority's affirmance of the interest award. I concur in the vacatur of punitive damages, but I would remand for the district court to consider awarding punitive damages under the appropriate standard.